Robert DONOVAN,
Plaintiff-Respondent,

v.

Jerome E. and Ann M. ROTH,
Defendants-Third Party
Plaintiffs-Appellants,

v.

H & B MASONRY COMPANY, Third
Party Defendant-Respondent.

No. 49382.

Missouri Court of Appeals,
Eastern District,
Southern Division.

Oct. 29, 1985.

Thomas L. Hoeh, Perryville, for defendants-third party plaintiffs-appellants.

Terry Robert Rottler, St. Genevieve, for plaintiff-respondent.

Roland A. Wegmann, Hillsboro, for third party defendant-respondent.

REINHARD, Judge.

The Roths appeal from a judgment for Donovan in the amount of $10,994.50 on his quantum meruit claim and from the dismissal with prejudice of their third party petition against H & B Masonry, Inc., at the close of the Roths' evidence, for failure to make a submissible case. We affirm.

In Donovan's quantum meruit action, he alleged that pursuant to a contract with the Roths he provided labor and materials, reasonably valued at $37,058.61, for the construction of their residence, and that $10,-994.50 of that sum remains unpaid. The Roths filed a counterclaim, in which they alleged that: 1) the agreed upon contract price was $65,000, and they had already paid in excess of that amount; 2) Donovan failed to complete the residence in a workmanlike fashion, and it would cost $15,000 to complete the house in accordance with the contract; and 3) Donovan was liable to them for damages in fraud and for breach of warranty. The Roths also filed a third party petition against H & B Masonry, Inc., alleging that the construction contract was between them and H & B Masonry. In Count I they requested reimbursement for any damages they were required to pay Donovan, while in Counts II and III they sought to recover damages from H & B Masonry under a breach of warranty theory and in fraud.

The action was tried by the court. At the end of Donovan's case, the Roths made a motion to dismiss, and, at the close of the Roths' evidence, H & B Masonry made a motion to dismiss. These motions were taken under submission along with the case. Ultimately the court overruled the Roths' motion and dismissed their third party petition with prejudice, holding that they failed to make a submissible case. The court rendered judgment for Donovan in the amount of $10,994.50.

At trial Donovan testified that he was a self-employed carpenter and had worked on numerous houses in that capacity. In late 1979 he was informed by Bob Rottler, the President of H & B Masonry, that the Roths were interested in building an "earth home." He contacted an architectural firm in Illinois and obtained some floor plans, along with a projection of construction costs. He was reimbursed by the Roths for his expenses in securing the blueprints, but the Roths decided that the estimated cost of the underground home was prohibitive, and elected not to proceed further on that project. A discussion between the Roths and Donovan regarding a conventional home ensued, with Dr. Roth telling Donovan to "keep kind of a figure of $85,-000 in mind" but providing no guidance as to square footage or layout. Donovan prepared a rough floor plan for a residence he said could be built for $85,000, not including finished wall or floor coverings.

Donovan testified further that he was hired by the Roths to perform the carpentry work on the residence diagramed in that floor plan and he began working on it in the Spring of 1980 without a written contract. As construction progressed, the Roths selected a number of unusually expensive features, and requested changes which increased construction costs. Although in most cases Donovan suggested material suppliers and people to perform non-carpentry work on the residence, the Roths made the ultimate choice on those matters. H & B Masonry was selected to provide masonry services on the project.

Donovan explained that it was a common practice for independent carpenters such as himself to obtain construction financing from others in the trade, and in this case he made arrangements with Rottler, the President of H & B Masonry, regarding financing on the project. For a fee, H & B issued weekly paychecks to Donovan, and handled workman's compensation, unemployment insurance and social security taxes through their records. H & B also paid for some supplies and materials. Donovan testified further that he occasionally used H & B Masonry stationery to submit his bills, and that he was to reimburse H & B for any funds they advanced to him. The Roths made some payments directly to Donovan, while others were made to H & B Masonry or to suppliers.

In early 1981, when only a few minor items remained unfinished, Donovan received a phone call from Dr. Roth informing him that the house had cost more than the Roths wanted it to and that he should cease work on the project. Dr. Roth told him to let previously ordered material "come in," but no additional material should be ordered, and requested that Donovan submit a final bill.

Donovan testified that he had been working as a carpenter since 1973, during which time he had built several houses, that he was familiar with the prices of construction materials, and that the charges made on the Roth project were fair and reasonable.

Dr. Roth testified that one evening Bob Rottler stopped by Roth's veterinary clinic regarding his dogs. During this visit, Roth mentioned that he and his wife wanted to build an underground or partially underground home, and the two men talked for about ten minutes. Mr. Rottler told him "he was interested and he said ... he had a carpenter that was interested in subterranean-type homes, too." Roth testified that "I told him we could get together and come up with some plans and see what we could build or at least get some ideas," and that he asked Rottler to have the carpenter "get in touch with him." About a week later, Rottler and Donovan met with the Roths to discuss the project, and Donovan said that he would contact a company in Illinois regarding blueprints and projected costs. Dr. Roth was not aware of any involvement by Rottler in procuring this information from the Illinois Company. Donovan relayed the cost estimates and blueprints to the Roths, and, after they decided an underground home was too expensive, he told them he would draw a rough floor plan for a conventional house. Donovan subsequently met with the Roths to discuss these new plans. Dr. Roth asked him what the project would cost, and Donovan replied, "in the neighborhood of sixty-five to seventy thousand dollars." Dr. Roth told him to "hold it down as best he could." No mention was made of floor coverings, although the estimate was for a "finished house."

Roth testified that while he understood some of the features he and Mrs. Roth sought to incorporate into the structure would entail additional expenditures beyond the original estimate, most of the items cited by Donovan as cost overruns were to be included in the original price figure. Dr. Roth also said that many of the "changes" were suggested by Donovan, and that some were instituted without the Roths' knowledge. Some other features, included in the original plan, were omitted at the Roths' request in an effort to decrease construction costs. Dr. Roth testified further that Donovan selected the subcontractors and dealt with most of them himself.

Roth also testified regarding some difficulties and problems that arose during construction. After the basement walls and subflooring were completed, construction ceased from May to July. The subflooring was allegedly left uncovered during this period and exposure to the elements led to warping of the plywood subflooring. It had to be "leveled" before the hardwood floor could be installed, a process accomplished by splitting some floor joists and adding more plywood. At the time the Roths told Donovan to discontinue work, the house was habitable and they were living in it. Dr. Roth testified that he and his wife have paid a total of $96,696.10 in construction costs.

Dr. Roth also said that from the time of the "subterranean home" meeting until his wife contacted H & B Masonry regarding the selection of bricks, there had been no discussion about the home with Rottler. In the Spring of 1981, Dr. Roth contacted Rottler and told him the project was running "way over cost." Roth asked Rottler to "come out and look at the house and see if he thought it was worth $100,000." Rottler made no comment concerning the quality of workmanship, but said, in regard to the cost of the project, that "he would get to the bottom of it." The next day, Donovan prepared a cost overrun statement, which he submitted to the Roths.

Three experts testified for the Roths: Merlin Guyot, a contractor, carpenter and lumber yard owner; Chris Moore, also a carpenter and contractor; and Donald Hoehn, a real estate appraiser. Guyot testified that carpentry labor on the Roth residence should have cost $18,500, that he could have built the house for $89,500, and that the project should have taken approximately four to six months to complete. He noted that control of the project is decreased and cost overruns occur where the project takes more than nine or ten months to finish. Moore testified that carpentry labor should have cost $18,000, and that he could build the house for $88,738. Hoehn testified that the Roth residence had a market value of $73,200 at the time of the trial. Both Guyot and Moore testified that the split floor joists were adequately repaired. Guyot testified the crack in the basement floor was unusually large, and Moore testified that it was probably caused by a boulder underneath the floor, something which most contractors would be aware of. However, neither believed it posed a problem to the structure. On cross-examination, Moore and Guyot testified that when they made their construction cost estimates, they had assumed they would have complete control of the project. Guyot also testified that he was familiar with the practice of lumber companies or contractors "carrying" carpenters, similar to the arrangement described by Donovan.

Rottler testified that H & B Masonry "work[ed] a hundred mile radius subcontracting masonry work," but did not do general contracting. He said that on one occasion, while he was at Dr. Roth's clinic to have his dogs treated, Roth mentioned that he and his wife were thinking about building an "earth home." They showed Rottler some preliminary plans, but did not request that he build anything for them. When they began discussing a carpenter, he said, "I've got a young fella [Donovan] living across the street." After the Roths expressed interest in obtaining the carpenter's services, Rottler said "I'll send him out and talk to you." Rottler had no further contact with the Roths until Mrs. Roth came to H & B Masonry to select the brick. He testified that after the Roths moved into the new house they contacted him, expressing dissatisfaction with the bills, and he told them he would talk to Donovan about their complaints.

Rottler testified further that H & B Masonry never had a contract to build the house, had no control over the project, and did not participate in the selection of material suppliers or those who would work on the residence. He also stated that he had agreed to "carry" Donovan on the project and provide financing, but that he was unaware of Donovan's use of H & B Masonry stationery.

On appeal, the Roths allege that, in regard to the judgment in favor of Donovan: 1) there was insufficient evidence that the services and labor were of benefit to them, and no evidence established that the services and materials were incorporated into the house; 2) there was no foundation for Donovan's opinion that the sums charged were fair and reasonable; and 3) Donovan no longer had an interest in $7,742.40 of the $10,994.50 he sought to recover, since H & B Masonry had already paid that portion of the outstanding bills.

The judgment in favor of Donovan must be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Here the trial court had the task of judging the credibility of witnesses and assessing the value of testimony. There was evidence that the Roths contracted with Donovan to provide the labor and materials in question, that he did provide such labor and materials in the construction of the Roths' house, and that the materials were incorporated into the structure. Furthermore, the house was habitable and the Roths were able to occupy it. Thus there was substantial evidence that the Roths benefited from the services and materials Donovan provided. The Roths also contend that Donovan had no

experience as a general contractor, and was not qualified to render an opinion regarding the fair and reasonable value of the labor and materials he provided. We note first that a witness may place a value upon his own services. *General Aggregate Corp. v. LaBrayere,* 666 S.W.2d 901,909 (Mo.App.1984). Here Donovan testified that he had been a carpenter since 1973, had worked on several houses while self-employed, and was familiar with the price of construction materials from prior dealings with other trades and material suppliers; thus there was a sufficient basis for his testimony as to the fair and reasonable value of the material and services at issue.

The Roths further contend that Donovan was not the real party in interest as to the $7,742.40 bill he admitted had been paid by H & B Masonry. Clearly, if that portion of the claim has been satisfied Donovan cannot recover for it. Since no findings of fact were made we must resolve all factual issues in accordance with the judgment, and we will affirm it if it can be upheld under any theory of law. *Young v. Ray America, Inc.,* 673 S.W.2d 74, 78 (Mo.App.1984). A reading of the entire transcript reveals that there was sufficient evidence for the trial court to determine that H & B Masonry's payment of the bill was a loan to Donovan. We therefore affirm the judgment against defendant for $10,994.50.

The Roths also allege that the trial court erred in dismissing their third party petition for failure to make a submissible case against H & B Masonry. As to this issue, the Roths are entitled to the most favorable view of all the evidence and must be given the benefit of all favorable inferences to be drawn therefrom. *Crouse v. Burkemper,* 593 S.W.2d 234, 235 (Mo.App. 1979). The Roths' pleaded theories of recovery against H & B Masonry derive from their allegation that:

> In December, 1979, during a conversation with Robert Rottler [the President of H & B Masonry, Inc.] the Defendant-Third Party Plaintiffs entered into an oral contract with the Third Party Defendant whereby the Third Party Defendant agreed to construct a residence ... for ... the amount of Sixty-five Thousand Dollars....

The record is devoid of evidence that such a conversation took place. The Roths' own testimony indicated that they had not been in contact with Rottler subsequent to the "earth home" discussions until Mrs. Roth went to H & B Masonry to select the brick for the new residence. Since there was no evidence of such a contract between H & B Masonry and the Roths, their third party petition was properly dismissed for failure to make a submissible case. Furthermore, in deciding in favor of Donovan on his claim, the court implicitly found that the contract was between Donovan and the Roths. Third party relief was not available under these circumstances.

Judgment affirmed.

DOWD, P.J., and CRIST, J., concur.