### In re ROSENBAUM GRAIN CORPORATION.

### NAIRN v. J. A. ACOSTA & CO. et al.

### No. 6650.

Circuit Court of Appeals, Seventh Circuit.

May 4, 1939.

George E. Q. Johnson, Luther D. Swanstrom, Walter E. Wiles, and William B. Basile, all of Chicago, Ill., for appellant.

John V. Norcross, William Ruger, and James A. Velde, all of Chicago, Ill., for appellees.

Weymouth Kirkland and Charles M. Rush, both of Chicago, Ill., for appellee McDonnell & Co.

Orville J. Taylor and John S. Miller, both of Chicago, Ill., for appellee Hayden, Stone & Co.

Walter Bachrach, Hamilton Moses, S. Sidney Stein, Robert Bachrach, and Herbert H. Kennedy, all of Chicago, Ill. (J. H. Oppenheim, of Chicago, Ill., of counsel), for appellees Prentice & Slepack and Maloney, Anderson & Block.

Lederer, Livingston, Kahn, Adler & Adsit, Charles Lederer and Philip C. Lederer, all of Chicago, Ill., for appellee Tucker Anthony & Co.

Matthews, Harmon, Karr & Springer and Joseph R. Harmon, all of Chicago, Ill., for appellees Francis I. du Pont & Co. and Kean, Taylor & Co.

Before SPARKS, TREANOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

In this case John L. Nairn, trustee of the estate of Rosenbaum Grain Corporation, appeals from an order allowing set-offs under Section 68a of the Bankruptcy Act on the ground that the claims in question lack mutuality. 11 U.S.C.A. § 108(a) provides that "In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid." See also 11 U.S.C.A. § 1(11): "'debt' shall include any debt, demand, or claim provable in bankruptcy."

In the instant case the debtor was a futures commission merchant (or grain broker), and a member of the Chicago Board of Trade. The claimants were New York stock brokers and members of the New York Stock Exchange. The debtor was a stock customer of each of the claimants-appellees[1] in their capacity as stock

---

[1] The claimants-appellees, Tucker Anthony and Co., Francis I. DuPont and Co., and Kean Taylor and Co., have written contracts with the debtor, as far as the relationship between the debtor as customer and the contract-claimants as stock brokers is concerned. The view we take in this case makes unnecessary any

brokers. In turn each of the claimants was a commodity customer of the debtor in its capacity as a futures commission merchant.

Stated in another way, the debtor maintained marginal stock accounts with the claimants, and the claimants maintained marginal grain accounts with the debtor. Thus, on April 23, 1935, the debtor was carrying grain contracts for the claimants, and they were carrying securities for the debtor. On that day, the debtor held an immature claim (or debt payable in futuro) against the claimants for the purchase price of the grain plus commissions, and the claimants held a mature claim (or debt payable in praesenti) against the debtor for the purchase price of the stock plus commissions.

On April 23, 1935 the debtor filed its voluntary petition for corporate reorganization under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207.[2] The district court then ordered the grain and stock accounts here in question closed. After the closeout, this situation remained: the claimants had on their books a balance belonging to the debtor; the debtor had on its books a balance belonging to the claimants. Thereupon, at the proper time, each claimant filed as his claim against the debtor an amount equal to the difference between the balances in the respective accounts. The trustee objected to each claim on the ground that the resulting off-set lacked mutuality. The district court, however, allowed the off-set under Section 68a of the Bankruptcy Act.

■■ It is plain that the object of Section 68a is "to permit," as its terms declare, "the statement of the account between the bankrupt and the creditor, with a view to the application of the doctrine of set-off between mutual debts and credits." Cumberland Glass Co. v. De Witt, 237 U.S. 447, 454, 35 S.Ct. 636, 639, 59 L. Ed. 1042. This Section, however, neither creates the right of set-off nor enlarges the doctrine of set-off, Lehigh Valley Coal Sales Co. v. Maguire, 7 Cir., 251 F. 581, recognizing "the nature of set-off, as established in common law and equitable procedure," Cumberland Glass Co. v. De Witt, supra, 237 U.S. page 455, 35 S.Ct. page 639, 59 L.Ed. 1042. That is, Section 68a "cannot be invoked in cases where the general principles of set-off would not justify it," Cumberland Glass Co. v. De Witt, supra, 237 U.S. page 455, 35 S.Ct. page 639, 59 L.Ed. 1042, the rule in bankruptcy, however, being "generally, even if not always, the rule in equity as well," Lowden v. Northwestern National Bank, 298 U.S. 160, 166, 56 S.Ct. 696, 699, 80 L. Ed. 1114.

■■ The determination as to whether a right of set-off exists under Section 68a lies within the discretionary control of the district court, to be exercised in accord with the general principles of equity. That court has the "primary duty of determining for itself whether there are 'mutual debts or credits' that should be set off one against the other," Cumberland Glass Co. v. De Witt, supra, 237 U.S. page 457, 35 S.Ct. page 640, 59 L.Ed. 1042. On September 27, 1937 the district court said: "It may be that the proceeds of the pledge after the payment of the debt due from a bankrupt pledgor may not be set off

---

consideration of a distinction between, or a separate grouping of, the contract-claimants and the other claimants.

[2] We are aware that recently the United States Supreme Court has stated that a "proceeding to reorganize is not a bankruptcy" and may only effect temporarily a provisional sequestration. Therefore, the Court stated that Section 68a does not necessarily control, governing "if at all, by indirection and analogy according to the circumstances." Of course, if Section 68a is not applicable, the equity rule would apply, which varies "with the needs of the occasion." Lowden v. Northwestern Bank, 298 U.S. 160, 163, 164, 56 S. Ct. 696, 698, 80 L.Ed. 1114. See also Lowden v. Northwestern Nat. Bank, 8 Cir., 84 F.2d 847; Iowa-Des Moines National Bank v. Lowden, 8 Cir., 84 F.2d

856; In re Associated Telephone Utilities Co., D.C., 12 F.Supp. 468.

In the Lowden case, the Supreme Court stated that "when all the facts are known, they may be found to offer no excuse for a departure from the rule in bankruptcy which, as indicated already, is generally, even if not always, the rule in equity as well." Lowden case, supra, 298 U.S. page 166, 56 S.Ct. page 699, 80 L.Ed. 1114. The district court, which had before it these necessary facts, determined that Section 68a was applicable. All the facts and circumstances of the reorganization proceeding not being available to us, we are not in position to hold that the district court erred in applying Section 68a. Therefore, in the instant case, the bankruptcy rule of set-off shall apply and govern in the disposition of the appeal.

against a general account of the bankrupt against the pledge. But here the Debtor held grain as security for the indebtedness of the claimants and the claimants held stock to secure the indebtedness of the Debtor. The positions were alike."

That same court, on November 15, 1937, after a motion to reconsider had been made, explained that "both the bankrupt and the creditor held property pledged to one another and were therefore acting in the same capacities 'mutual' within the meaning of that term as employed in Section 68a of the Bankruptcy Act."

The trustee, who has perfected his appeal from the allowance order, bases his assignment of errors on the proposition that the obligations or claims in question are not mutual. He contends that the relationship between a stock broker and his customer is one of pledgee-pledgor, whereas the relationship between the grain broker and his customer is simply one of creditor-debtor. In addition, he insists that closing out the securities account leaves an obligation due in a fiduciary capacity, whereas the closing out of the commodities account leaves an obligation due in a simple creditor-debtor capacity. He concludes, therefore, that the obligations, not owing in the same capacities, are not "mutual debts or mutual credits."

■ When the necessary mutuality exists is a problem which the usual formula (that is, that the claims must be owing to and be due in the same right and capacities) does not solve. The basic question in this case, which has never been answered before, is whether the necessary mutuality exists, where the transactions involve on the one hand the carrying of stock certificates by the broker for his customer, and, on the other hand, the carrying of commodity contracts by the broker for his customer. We are of the opinion that the district court did not err in its application of Section 68a to this situation, because the necessary mutuality exists.

To agree with appellant's contention would be in effect to close our eyes to the realities of the situation and to ignore essential similarities and equities. We perceive no practical distinction between the activity in the securities market and the activity in the commodities market. The Chicago Board of Trade came into existence in 1859. For a long period of time futures contracts were frowned upon by the courts as being gambling contracts.

An Illinois legislative committee in 1883 was unable to see much difference between transactions on the Chicago Board of Trade and those in bucket shops. In time, this attitude toward organized trading in commodity futures changed, and, today, the activity around the futures and securities exchanges is essentially similar and so looked upon by the courts and the legislative bodies. This attitude was forthcoming as soon as the people began to see that the trading in futures in any commodity is an adjunct to, and part of, the marketing of that commodity. See New York & Chicago Grain & Stock Exchange v. Board of Trade, 127 Ill. 153, 161, 19 N.E. 855, 2 L.R.A. 411, 11 Am.St.Rep. 107; Board of Trade v. Christie Grain & Stock Co., 198 U.S. 236, 249, 25 S.Ct. 637, 49 L. Ed. 1031; Board of Trade v. Olsen, 262 U.S. 1, 20, 39, 43 S.Ct. 470, 67 L.Ed. 839; United States v. New York Coffee & Sugar Exchange, 263 U.S. 611, 619, 44 S. Ct. 225, 68 L.Ed. 475; 32 Ill.L.R. 155; Hoffman, Future Trading upon organized commodity markets (1932); Note 45 Harv.L.R. 912; and Emery, Speculation on the Stock and Produce Exchange (1896).

In each instance the course of dealing terminates in the transfer of property from one owner to another. The intricate machinery involved, i. e., the exchanges, The New York Stock Exchange and the Chicago Board of Trade, perform the same function, the facilitation of transfers in ownership. The actual parties here in question, the brokers, perform the same service in bringing purchasers and sellers together, and serve in a distinct fiduciary capacity to their customers. In addition, the two markets are affected similarly with a national public interest, which necessitates regulatory legislation to control the commercial transactions and practices arising from the trading. See Grain Futures Act, 42 Stat. 998, 7 U.S.C.A. § 1 et seq.; Commodity Exchange Act of 1936, 49 Stat. 1491, 7 U.S.C.A. § 1 et seq.; Securities Exchange Act of 1934, 48 Stat. 881, 15 U.S.C.A. § 78a et seq.; Irwin, Legal Status of Trading in Futures; 32 Ill.L.R. 155, 168, 169; and Note, 45 Harv. L.R. 912. Thus, we see that each activity represents a similar picture in our economic life, involving the use of credits, furnishing a meeting place for the buying and selling public, and affecting the movement of property and goods in interstate commerce. To us it follows logically that

the debtor, the broker in the futures picture, is serving in the same capacity as the claimants, the brokers in the securities picture.

■ On stock exchanges, most contracts between brokers are executed under rules which compel immediate delivery. Constitution of the New York Stock Exchange, Art. 23, Sec. 3. On commodity exchanges, however, the most transactions between brokers are closed out before time for delivery by means of counter-transactions. Irwin, Legal Status of Trading in Futures, 32 Ill.L.R. 155, 157. This difference, to the extent that it affects validity, has been rendered immaterial by the case of Board of Trade v. Christie Grain & Stock Co., supra. See also Note, 83 A.L. R. 522 and Note, 40 Harv.L.R. 638. On the stock and commodity exchanges, the broker and his customer stand to each other as principal and agent. This relation, contemplating as it does the holding by the broker of the customer's money and other property, is primarily fiduciary in nature. The difference in the contracts—the stock contract calling for immediate delivery, the commodity contract calling for future delivery—does not affect the fiduciary relation itself. The Securities and Exchange Act of 1934 and the Commodity Exchange Act of 1936 recognize this fiduciary relationship and provide against violations thereof.

Our study of exchange transactions in securities and commodities has convinced us that for all practical purposes the slight differences in the activity of the brokers and the exchanges are immaterial here. We find that resort to the realities and economics of the situation existing on the exchanges justifies the conclusion that for purposes of set-off the grain broker and the stock broker perform similar functions and tasks and serve their customers in a fiduciary capacity. The factual situations being essentially alike, it follows that the grain broker and stock broker in the instant case owed each other in the same capacity, and that the cash proceeds from the sale of the collateral securities should be set off against the cash proceeds from the sale of the collateral grain contracts.

At the beginning, the customer orders the broker to buy (or sell) stock or grain. The customer pays him a marginal fund, which is held by the broker for a special purpose. The stock broker holds this fund, temporarily, for application against the purchase price to be advanced by himself, and the fund is applied against the credit advanced as soon as the stock is purchased. The commodity broker holds this fund, ordinarily a longer period, as a "pledge against loss" from market price fluctuations, Jones v. Marks, 40 Ill. 313, 315; Larminie v. Carley, 114 Ill. 196, 205, 29 N. E. 382, or as an "indemnity against liability" incurred when the broker contracts with other brokers for the purchase of grain to be delivered in the future. Rules and Regulations of Chicago Board of Trade, Rule No. 209. At this point it is interesting to note that were this contract consummated by delivery of the grain, the marginal guaranty fund, which is held specially throughout, (The Commodity Exchange Act prohibits mingling of the margins deposited by the customer with funds of the commission merchants (grain brokers) Sec. 4d of the Act, 7 U.S.C.A. § 6d), would then be applied against the purchase price advanced, the same as in the stock transaction. The stock and grain dealings between broker and customer are, thus far, fundamentally the same.

After the execution of the order in accordance with the customer's instructions, the broker carries the marginal accounts for his customer.[3] The stock broker carries the purchased securities as collateral for his credit advance to the customer. The grain broker carries the purchased grain, evidenced by the commodity contract,[4] as collateral for his credit advance

[3] While the broker and customer stand to each other in an agency relationship, the exchange rules require the broker to stand as principal when he contracts on the floor with other brokers. Constitution of the New York Exchange, Art. 24, Sec. 9; Rules and Regulations of the Chicago Board of Trade (1938), Rules 200, 310, 314, 316. Thus a single exchange transaction usually involves two distinct contracts: one between the bro-

kers on the exchange and the other between the broker and the customer.

[4] See Rules and Regulations of the Chicago Board of Trade (1938), Rules 314, 316, which provide that the commodity contract, once cleared, carries the responsibility of the Clearing House behind it. This, of course, has reference to the contract between the brokers on the exchange. See f. n. 3. It is this contract which occupies the same position as

to the customer[5]. It is again interesting to note that were this contract consummated by delivery of the grain that it represents, the situation would then exactly parallel the stock transaction. Thus, at this phase of the dealings, the factual situations underlying the respective transactions are fundamentally alike: one broker carries certificates of stock and the other carries commodity contracts.

In essence, transactions that occur on the stock and commodity exchanges give rise to secured obligations, the broker in each instance advancing credit to the customer and securing this by collateral. In each case, the collateral is never the property itself, but only a symbol of that property. For example, the certificates of stock, kept in the broker's "box" and not bearing the signature of any customer, evidence the actual shares of stock. Similarly, the commodity contracts, bearing the support of the Clearing-House, evidence the grain. Like the certificates, the contracts are invested with the attributes of assignability and transferability. These property rights have value, and, as was done in this case, are convertible to money to the same extent as warehouse and trust receipts.

Making the factual parallel between the two transactions even more striking to us than their essential similarity in mechanical characteristics, purposes, and functions is another element. We find that a spirit of trust and fidelity necessarily pervades the entire dealing between broker and customer. This fiduciary relation plus the nature of the dealing itself, affected as it is by the public interest, has led in each instance to parallel regulation by the exchanges, legislatures, and Congress. The agency relation, the advancing of credit, the customer's money and property as collateral or security, and the closing out of accounts are clear indications that in each case the broker acts in a fiduciary capacity toward his customer.

In view of what has been said, it is clear that the district court was correct in holding that the grain broker and the stock broker owed each other in the same capacity. In passing it is interesting to apply the legal principles to these commercial transactions. The relation of stock broker to his marginal customer is held to be threefold. The broker is the customer's agent for the purchase of the stock, his creditor for the amount advanced to complete the purchase, and a pledgee in holding the stock as security for the credit advanced. Meyer, Stock Brokers and Stock Exchanges, Commodity Brokers and Commodity Exchanges, (1931), vol. 1, pp. 249–312; Markham v. Jaudon, 41 N.Y. 235; Hunt v. Rosenbaum Grain Corporation, 355 Ill. 504, 513, 189 N.E. 907.

After due consideration we have come to the conclusion that no valid reason exists, in view of the realities, for treating the grain broker differently than the stock broker. Smith v. Craig, 1914, 211 N.Y. 456, 105 N.E. 798, Ann.Cas.1915B, p. 940, Note. And, although litigation concerning transactions on the produce exchanges has centered mostly around the validity of the "future" contract, Chicago Board of Trade v. Christie Grain & Stock Co., supra, Note, 40 Harv.L.R. 638, the scant authorities that exist have given similar legal treatment to the grain broker. The applicable law in this regard has been stated as follows: "A broker who has purchased a commodity future on behalf of a customer cannot technically be a pledgee of the commodity which is the subject of the future contract, for the reason that the commodity is not actually delivered during the pendency of the contract. However, he is regarded in law as an equitable pledgee holding the contract as security for his customer's indebtedness and having the right similarly to hold the commodity upon maturity of the contract." Meyer, op. cit., supra, p. 257, (1931).

This statement of the applicable law is consistent with the facts in the economic situation prevailing on the exchanges. Although Illinois is a state in which grain transactions occur very frequently, the

---

the certificates of stock in the case of a stock transaction. The operation of exchange clearing houses is, in principle, the same as that of bank clearing-houses. Emery, Speculation on the Stock and Produce Exchanges, (1896), pp. 65–72.

[5] The appellant admits in his brief that the customer's obligation is one in debt.

In fact, the obligation is immature, in that the customer owes the grain broker payable in futuro. The debtor grain broker in our case owed each stock broker payable in presenti. See Clark, Set-Off in Cases of Immature Claims in Insolvency and Receivership, 34 Harv. L. R. 178. The general rule is that such obligations are subject to set-off.

Illinois courts have never had occasion to pass on the question as to whether the grain broker is an equitable pledgee. There is a case, however, which indicates that the idea of an equitable pledgee is not foreign to Illinois courts. Morganstein v. Commercial National Bank, 125 Ill.App. 397, 400.

Of course, when the courts hold that the broker is a "pledgee", they mean that the broker carries property essentially as a pledgee and not as owner thereof, although he may not be strictly a pledgee as known at the common law.[6] The United States Supreme Court has held that a stock broker is not strictly a pledgee as understood at common law. Richardson v. Shaw, 209 U.S. 365, 380, 28 S.Ct. 512, 52 L.Ed. 835, 14 Ann.Cas. 981. And, the Illinois Supreme Court has held that a grain broker is not strictly a pledgee as understood at common law. Corbett v. Underwood, 83 Ill. 324, 25 Am.Rep. 392. In substance, however, the law is that the stock broker is essentially a pledgee and the grain broker is essentially a pledgee in equity. We might conclude, therefore, and the Illinois law is not inconsistent with such a conclusion, that, for purposes of set-off and mutuality of debts, the grain broker and the stock broker are acting toward each other in the same capacity, in that each of them hold property pledged to one another.

■ Counsel for appellant contends that this court is obliged to follow the Illinois case law. We do not disagree with him in this regard. We have examined Corbett v. Underwood, supra, upon which he primarily bases his argument, and find that the court merely repeated what is law everywhere, that the grain broker is not strictly a pledgee as known at the common law.[7] The Illinois courts have never discussed the point as to whether a grain broker might not be treated as an equitable pledgee. Moreover, in the respect that such technical description of a grain broker was not indispensable to the decision, what little light Corbett v. Underwood, supra, sheds on the problem in question is not compelling upon us.

Assuming that the Corbett case governed here and that it meant what appellant claims it does, it would still be our belief that the mutuality necessary to sustain the set-off exists. We can not ignore realities or value technicalities at a premium. The truth of the matter is that transactions taking place every day on the stock and grain exchanges produce obligations secured by collateral and imply a fiduciary relationship between broker and customer. The brokers here, acting toward each other as broker and as customer, necessarily acted toward each other in the same capacities. The necessary mutuality existed, and the balances in the respective accounts were properly set off one against the other.

We have given serious attention to appellant's brief. To heed the argument made there, in our opinion, is to prize form above substance. To argue that the applicability of Section 68a of the Bankruptcy Act is dependent upon a possible distinction between a pledge of stock certificates as security and a holding of grain contracts as security is to adhere unnecessarily to technicality. The district court's order allowing a set-off of the respective obligations is affirmed.

[6] The incongruous features in the relation, as far as stock transactions are concerned, are many. For instance, the securities in pledge are not ordinarily in the name of the customer. The certificates are only evidence of the property. The owner-customer has not delivered the pledgee into possession. And, ordinarily, the broker has the right to repledge.

The incongruous features in the relation, as far as grain transactions are concerned, are as many, with one addition: The property in pledge is a contract. See Williston, Contracts, Vol. 4, Secs. 1042–1045, (1936). That there is no real distinction between certificates of stock and commodity contracts as a subject of a pledge, see Smith v. Craig, 1914, 211 N.Y. 456, 105 N.E. 798, Ann.Cas.1915B, 937. See also, 19 Harv.L.R. 557.

[7] The Corbett case, decided in 1876, was a law action brought at a time when procedural distinctions between law and equity were rigidly enforced. The court, therefore, was not able to apply the equitable rule that in equity a pledgee-pledgor relationship existed between grain broker and customer. Justice Dickey, moreover, concurred in the decision but refused to follow the opinion which made a distinction between a grain broker and an ordinary pledgee. In addition, this case was rendered in 1876 at a time when the law frowned upon "future" contracts as being gambling transactions. In this law case in 1876, equitable matters could not have been considered. In our problem, equitable considerations carry great weight.