J.L. GRISWOLD and Patricia
Griswold, Plaintiffs,

v.

E.F. HUTTON & CO., INC., Arthur
Lassila and Robert Stieren,
Defendants.

No. 85C4948.

United States District Court,
N.D. Illinois, E.D.

Nov. 25, 1985.

Joel J. Bellows, Nicholas P. Iavarone, Bellows & Bellows, Chicago, Ill., for plaintiffs.

John J. Enright, Robert P. Bramnik, Andrew B. David, Marjorie E. McCollom, Arvey, Hodes, Costello & Burman, Chicago, Ill., for defendants E.F. Hutton and Arthur Lassila.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

J.L. Griswold and his wife Patricia ("Griswolds") sue E.F. Hutton & Co., Inc. ("Hutton") and two Hutton account executives, Arthur Lassila ("Lassila") and Robert Stieren ("Stieren"), for civil damages based on the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1–26 and violations of fiduciary duty under state law. Hutton and Lassila have moved under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss the Amended Complaint (the "Complaint") in its entirety as to them.[1] For the reasons stated in this memorandum opinion and order, their motion is denied.

### Facts [2]

In November 1983 Lassila, a former classmate of J.L. Griswold, learned Griswolds had sold their business and had a large sum of money available for invest-

---

1. This Court dismissed Stieren from the RICO count in an August 26, 1985 oral bench ruling.

2. For purposes of the current Rule 12(b)(6) motion, this opinion has accepted as true the Complaint's well-pleaded factual allegations, drawing all reasonable factual inferences in favor of Griswolds. *Wolfolk v. Rivera*, 729 F.2d 1114, 1116 (7th Cir.1984). Of course no actual find-

ment (¶ 14).[3] During November and December 1983 Lassila had several conversations with J.L. Griswold in which he "extolled" the advantages of Hutton's Managed Commodity Account Program ("MCAP") as an investment vehicle (¶ 15). Griswolds were convinced by Lassila's presentation of MCAP and decided to invest in it. On December 7, 1983 Griswolds opened several accounts with Hutton, depositing some $775,000 for use in trading commodities (¶ 25). On January 26, 1984 Griswolds invested a further $250,000 (¶ 26).

Lassila described MCAP to Griswolds as a program for trading commodity futures by drawing on the abilities of several Commodity Trading Advisers ("Advisers") at once. MCAP provided Hutton's customers with a number of Advisers, each of whom would separately trade an account established in the customer's name by Hutton. Thus MCAP was supposed to be a means of diversifying the risk associated with commodities trading (¶ 15).

Lassila ultimately introduced J.L. Griswold to six Advisers. Five of those—Cresta Commodity Management, Inc. ("Cresta"), Orion, Inc. ("Orion"), A.O. Management Corp. ("A.O."), Institute for Computer Studies of Commodities ("ICSC") and Colorado Commodities Management Corp. ("Colorado")—were "outside" Advisers participating in Hutton's program. Stieren, a Springfield, Illinois Hutton account executive, was the sixth. All were recommended to Griswolds by Lassila, who promised he would oversee the activities of the Advisers on a daily basis to insure adherence to a trading plan and to control risks (¶ 22-23, 25).

Griswolds signed a client agreement (the "Client Agreement") with Hutton that included authorization for Stieren to trade on their behalf (Ex. A-1). Griswolds also signed individual authorization agreements with Cresta,[4] Orion, A.O., ICSC and Colorado, each authorizing the individual Adviser

to trade a designated dollar amount on account with Hutton (Exs. A-2 to A-7).

On January 28, 1984 Lassila sent a handwritten note (Ex. E) to J.L. Griswold:

Dear Jim:

I wish to acknowledge the managed commodity account established in our Springfield office being managed by Bob Stieren. The account was funded in December, 1983 with $150,000 and an additional $250,000 on January 26, 1984. My understanding through your discussion with Bob is that the $150,000 is a general trading account with a ~~maximum~~ approximate stop-loss of $75,000. Further the $250,000 sized account is for the special situation which Bob perceives to be unfolding in the relatively near term. The stop-loss on this part of the account is an additional $75,000.

The nature of Stieren's trading since the account's inception has involved large positions and heavy trading resulting in heavy commission generation approximating 50 to 100% of original account equity per month. While the nature of markets could change from trading markets to trending markets and therefore reducing transaction activity, it can not be anticipated when this might occur. It is acknowledged that commissions in this account are running well above the usual commissions in managed commodity accounts. In view of this I will make an effort to obtain a large discount for this account retroactive to early December.

Cordially,

Arthur Lassila

Acknowledgement of
Letter and Stop-loss.

/s/ J. Griswold

Jim Griswold

Jan. 28, 1984

J.L. Griswold signed the acknowledgment.

On February 21, 1984 J.L. Griswold met Lassila at Hutton's Peoria, Illinois office to

---

ings of fact are made or implied by the recital in the text.

**3.** Citations to the Complaint will simply take the form "¶ —" and, in referring to documentary exhibits to the Complaint, "Ex.—."

**4.** Griswolds signed two agreements with Cresta, one for general trading (Ex. A-2) and one for financial futures trading only (Ex. A-3).

obtain the discount mentioned in Lassila's January 28 letter. Lassila tendered Hutton's check (Ex. G) for $59,134 made out to "James Griswold & Patricia R. Griswold JTWROS." [5] Lassila said that was the amount due Griswolds after the commissions were discounted, and he also tendered a one-page single-spaced typed document (the "Release," Ex. F), which he said Hutton needed signed to show the discount on Stieren's commissions was final. In relevant part the Release reads:

#### RECEIPT AND GENERAL RELEASE AND ASSIGNMENT OF CLAIM

1. For and in consideration of the sum of Fifty Nine Thousand One Hundred Thirty Four [ ] dollars ($59,134), receipt of which is hereby acknowledged, _____ and _____ ("GRISWOLDS") hereby release, discharge and acquit E.F. Hutton & Compnay [sic] Inc. ("HUTTON") and its representatives, including, without limitation, its agents, employees, servants, directors, officers, attorneys, assigns and successors, and each of them, with the exception of Mr. Robert D. Stieren of and from any and all claims, demands, sums of money, actions, rights, causes of action, obligations and liabilities of any kind or nature whatsoever which the GRISWOLDS may have had or claim to have had, or now have or claim to have, hereafter may have or assert to have, including, without limitation, those which arise out of or are in any manner whatsoever, directly or indirectly, connected with or related to a certain account number F73–99919 standing in the GRISWOLDS name at Hutton's branch office in Springfield, Illinois and any act, omission, transaction, dealing conduct or negotiation of any kind whatsoever between the GRISWOLDS and Hutton or between anyone acting or purporting to act on their respective behalves.

\* \* \* \* \* \*

3. The GRISWOLDS warrant, represent and agree that in executing this release, and in accepting the consideration described herein, they do so with full knowledge of any and all rights which they may have with respect to the controversies herein compromised and that they have received independent legal advice from their attorney with regard to the facts relating to said controversies and with respect to the rights and asserted rights arising out of said facts. In this regard, the GRISWOLDS understand, acknowledge and agree that such payment is not an admission of liability on the part of Hutton, but to the contrary, represents a compromise of claims asserted against Hutton, which are expressly contested, disputed and denied.

\* \* \* \* \* \*

5. This release shall inure to the benefit of Hutton and shall be binding upon the GRISWOLDS, their assigns, representatives and successors. The GRISWOLDS acknowledge that they have read this receipt, general release and assignment of claim, and that they fully know, understand and appreciate its contents and that they execute the same and make the settlement provided for herein voluntarily and of their own free will. In witness whereof, the undersigned have executed this receipt and general release as of the date hereinafter appearing.

When J.L. Griswold signed the Release he believed, based on Lassila's statements, he was agreeing only not to seek further discounts on Stieren's trades (¶ 34).

Stieren's last trade on Griswold's account was on February 15, 1984. During the two-month-plus trading period, Stieren generated $196,893 in total commissions on the $400,000 entrusted to him (¶ 29 and Ex. B).

Although Stieren's account had been funded in full for $400,000, the accounts of the other Advisers were not. Lassila told Griswolds it was Hutton's practice to fund

---

**5.** In familiar securities usage, that of course stood for "joint tenants with right of survivorship."

such accounts with "fifty-cent dollars," so the Advisers believed there was twice as much money available for trading as was actually the case. Lassila told Griswolds that procedure would work to their benefit (¶ 24).[6] Each individual agreement with an Adviser (other than Stieren) indicates account funding at twice the amount actually deposited by Griswolds with Hutton.

Griswolds' investment in MCAP was a disaster. By May 4, 1984 they had sustained losses of $542,232 in trading, while incurring $298,827 in commissions to Hutton and $19,708 in fees to the outside Advisers (¶ 31). In total about 84% of some $1,025,000 Griswolds invested in Hutton's MCAP had evanesced.

Griswolds' Complaint asserts (with considerable redundancy) various forms of fraud and misrepresentation as predicates for their RICO, CEA and state-law claims:

1. churning of accounts by Stieren;

2. intentional failure by Hutton and Lassila to supervise and curtail Stieren's trading;

3. misrepresentation of the profit and risk potential of MCAP;

4. failure to coordinate the Advisers' trading to achieve the promised coherent plan;

5. concealment of reasons for trading losses;

6. misrepresentation of the amount of funds available to the outside Advisers with the intent to generate increased trading and higher commissions;

7. rendition of statements in a form (by individual Adviser's account) designed to disguise the total volume of trading and commissions;

8. misrepresentation of the contents and legal impact of the Release; and

9. breach of the common-law fiduciary duty to account for secret profits obtained through improper use of Griswolds' funds on deposit.[7]

Two grounds for Rule 12(b)(6) dismissal have been asserted on the current motion:

1. This action is barred as a matter of law by the Release.

2. Even if the Release is not a bar, the Complaint (including its attached Exhibits) does not state a claim under any of the legal theories advanced.

### Release

Griswolds initially argue the Release cannot be considered on a Rule 12(b)(6) motion because it is an affirmative defense required by Rule 8(c) to be made by way of a responsive pleading. That argument is simply incorrect, and Griswolds' attorney should know better.

█ Of course "release" is included in Rule 8(c)'s list of affirmative defenses and must be pleaded to be considered at all, *National Compressor Corp. v. Carrow,* 417 F.2d 97, 102 (8th Cir.1969).[8] But it is black-letter law that on a Rule 12(b)(6) motion a court may take into account "the allegations in the complaint ... *and exhibits attached to the complaint....*" 5 Wright & Miller, *Federal Practice & Procedure: Civil* § 1357, at 593 (1969) (emphasis added); see also 2A *Moore's Federal Practice* ¶ 12.07[2.–5], at 12–68 (2d ed. 1985 revision) ("material which is submitted as part of the complaint ... may be considered by the court"). See also *Goodman v. Board of Trustees of Community College District 524,* 498 F.Supp. 1329, 1337 (N.D.Ill.1980). Griswolds themselves brought the Release into this litigation by

---

**6.** Griswolds do not identify Lassila's explanation of the benefit.

**7.** This Court's August 5, 1985 oral bench ruling struck from the RICO count Griswolds' allegation that Hutton had utilized Griswolds' funds as part of a massive checkkiting scheme. That same allegation had earlier been stricken from the original Complaint.

**8.** Griswolds Mem. 3 erroneously cites *National Compressor* as having been decided by our

Court of Appeals (which, if true, would render the case binding on this Court and not merely persuasive). While that may well be the result of typographical error only, counsel must recognize the importance of accurate citation to avoid misleading the court. As *National Compressor* does not stand in any event for the proposition Griswolds seek to establish, the error is (according to one's perspective) either magnified or nullified.

attaching it as Complaint Exhibit F. Hence this Court may unquestionably consider it.[9] *Quiller v. Barclays American/Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir.1984), *aff'd and reinstated en banc*, 764 F.2d 1400 (11th Cir.1985).

Next the parties argue the choice-of-law question. Defendants' contentions in that area are varied, while Griswolds' contention is simple.

Hutton and Lassila urge the Release must be interpreted according to New York law because all Griswolds' claims arise from their customer relationship with Hutton—a relationship governed by the Client Agreement (Ex. A–1), which reads in part:

> This agreement and its enforcement shall be governed by the laws of the state of New York. . . .

Though the RICO and CEA claims concern federally created rights, Hutton and Lassila also assert a federal court should look to state law (again New York law, in their view) to interpret a contract releasing federal claims.[10] Finally they say the Release is a valid bar to this action even if Illinois law were applied.

To all this Griswolds retort that no choice-of-law language appears in the Release itself, which was signed and dated in Illinois. Griswolds therefore say the Release must be interpreted under Illinois law, especially because (in their view) it concerned solely the discounts on Stieren's trading, all of which took place in Illinois.

Were this Court limited to a choice between Illinois and New York law, it would incline toward the former. Clearly the Release is not the same as (nor does it refer to) the Client Agreement. So it is not, in the words of the latter document, "this agreement." And only by a tortured leap of logic could the Release be considered an effort to "enforce" the Client Agreement—especially when Hutton expressly denied any liability in the Release.[11] Thus the New York choice-of-law provision is by its terms inapplicable to the Release. Because the Release was executed by the parties in Illinois and released claims relating to transactions more closely related to Illinois than New York, the Release's "most significant contacts" are with Illinois. See *Dr. Franklin Perkins School v. Freeman*, 741 F.2d 1503, 1515 n. 19 (7th Cir.1984); *Sears, Sucsy & Co. v. Insurance Co. of North America*, 392 F.Supp. 398, 403 (N.D.Ill.1974).

But both sides have ignored controlling precedent holding *federal* law must apply here. That is so because the litigants do not stand in the same position as those in *Three Rivers Motors* or *Oberweis* (see n. 10). Both those actions sought to construe and enforce the release of federally-created claims. By contrast, Griswolds challenge their Release as void on fraudulent misrepresentation grounds.[12] They specifically allege Lassila misrepresented to J.L. Griswold the contents and legal impact of the

---

**9.** Indeed, the case most strongly relied on in Griswolds' memorandum, *Butcher v. United Electric Coal Co.*, 174 F.2d 1003, 1006 (7th Cir. 1949) explicitly says if an affirmative defense is "apparent on the face of the complaint," it may be considered on a Rule 12(b)(6) motion. *Butcher* sustained the complaint before it because plaintiff did *not* plead a release. Instead, defendant raised a release for the first time in its Rule 12(b)(6) motion.

**10.** To that end they cite *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 888–92 (3d Cir.1975) (applying state contract law in interpreting release of federal antitrust claim) and this Court's decision in *Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*, 568 F.Supp. 1096, 1098 n. 5 (N.D.Ill.1983) (same).

**11.** Had Hutton admitted liability for breach of the Client Agreement, it might be possible to characterize the Release as an effort to enforce

rights granted to Griswolds in the Client Agreement. However, Hutton's language in the Release expressly refutes such a characterization. For the same reason, Hutton's and Lassila's argument that the Release is "inseparably related" to the Client Agreement in the sense used by *Southwest Forest Industries, Inc. v. Sharfstein*, 482 F.2d 915, 919 (7th Cir.1972) fails on the facts.

**12.** Alternatively Griswolds claim they did not intend the Release as a general release of all claims, but rather as a release solely of claims related to Stieren's trading. True enough, that is an interpretation question. But because it varies from the literal language of the Release, it too must rest on Lassila's allegedly fraudulent statements as to the Release's scope.

Release. See *Seredinski v. Clifton Precision Products Co.*, 776 F.2d 56, 59–60 (3d Cir.1985) (discussing distinction between actions to enforce and actions to void settlements of federal claims).

■ No doubt the broad language of the Release ("any and all claims, demands, sums of money, actions, rights, causes of action, obligations and liabilities of any kind or nature whatsoever ... including, without limitation, those which arise out of [the Stieren account]") could be found sufficient (more of this later) to release Hutton and Lassila from RICO and CEA claims of which Griswolds were aware or that they "could have discovered upon reasonable inquiry." *Oberweis*, 568 F.Supp. at 1101. Compare, e.g., *Green v. Valve Corp. of America*, 428 F.2d 342, 345 (7th Cir. 1970) (typical broad general-release language) with *Oglesby v. Coca-Cola Bottling Co. of Chicago/Wisconsin*, 620 F.Supp. 1336 at 1341–42 (N.D.Ill.1985) (construing release language narrowly). But even if the language of the Release sufficed as a general release under Illinois or New York law, the *validity* of a release of federally created rights is a question of federal law. *Dice v. Akron, Canton & Youngstown Railroad Co.*, 342 U.S. 359, 361–62, 72 S.Ct. 312, 314–15, 96 L.Ed. 398 (1952). See also *Locafrance U.S. Corp. v. Intermodal Systems Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir.1977) (citing *Dice*):

> It is well established that federal law governs all questions relating to the validity of and defenses to purported releases of federal statutory causes of action.[13]

There is substantial authority for the view federal law would require submission of the question of fraud to the jury even in the face of the Release's inclusive language. *Dice* involved a railroad employee who sued for a job-related injury under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60. He admitted signing a comprehensive and unequivocal release but claimed he had relied on the railroad's "deliberately false statement" that the document was merely a receipt for back wages (342 U.S. at 360, 72 S.Ct. at 313). That was held by the Court to pose a question of fact for the jury, not one of law for the trial court (*id.* at 363, 72 S.Ct. at 315), because (*id.* at 362, 72 S.Ct. at 314–15):

> We hold that the correct federal rule is ... a release of rights under [FELA] is void when the employee is induced to sign it by the deliberately false and material statements of the railroad's authorized representatives made to deceive the employee as to the contents of the release.

*Dice*'s result was reached without recourse to such familiar arguments as duress, inequality of bargaining power, the employee's lack of sophistication or the absence of arms'-length negotiations. Nor did the Court point to special equities that might distinguish FELA cases from actions under other federal statutes. Nonetheless some courts have suggested those factors ought to be considered in limiting *Dice*'s scope. For example *Locafrance*, 558 F.2d at 1114–15 held a release "signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel" would be enforced if unambiguous on its face, though in personal injury cases, "where mistake, fraud, or overreaching against an individual is suspected," courts may look behind the agreement.[14]

Absent controlling authority in our Circuit (and the parties have identified none [15]), it appears to be an open question

---

**13.** *Locafrance* also rejected the notion a contractual choice-of-law provision should govern the question of the validity of a release of federal securities law claims.

**14.** *Locafrance* relied on New York cases to substantiate that distinction, even though the court went on to hold federal, not state, law was applicable to test the validity of releases of federal claims.

**15.** Hutton and Lassila cite the language in *Richard's Lumber & Supply Co. v. United States Gypsum Co.*, 545 F.2d 18, 20 (7th Cir.1976), *cert. denied*, 430 U.S. 915, 97 S.Ct. 1326, 51 L.Ed.2d 593 (1977), to the effect that general releases of federal antitrust claims are not against public policy unless procured by duress. It would strain that precedent impermissibly to hold a release procured by *fraud* would be enforceable where one procured by *duress* would not. In

whether *Dice* is to be given full force and effect outside the personal injury context. There is something to be said on each side of that proposition.

On the one hand, venerable authority supports the idea that failure to read a contract does not excuse performance. As *Vargas v. Esquire*, 166 F.2d 651, 654 (7th Cir.1948), *cert. denied*, 335 U.S. 813, 69 S.Ct. 29, 93 L.Ed. 368 (1948) (some citations omitted) put it:

> And in the absence of fraud, which must be proved by clear and convincing evidence ..., a man in possession of all his faculties, who signs a contract, cannot relieve himself from the obligations of the contract by saying he did not read it when he signed it, or did not know or understand what it contained. *Upton v. Tribilcock*, 91 U.S. [ (1 Otto) ] 45, 50, 23 L.Ed. 203. To be sure, if his signature is secured by some fraudulent trick or device as to the context of the contract, which prevents him from reading the agreement, he may by proper action avoid the contract.... But the contract cannot be avoided by proof that one of the parties, if he was sound in mind and able to read, did not know the terms of the agreement. One must observe what he has reasonable opportunity for knowing; the law requires men, in their dealings with each other, to exercise proper vigilence [sic] and give their attention to those particulars which may be supposed to be within reach of their observation and judgment and not to close their eyes to the means of information which are accessible to them. A person is presumed to know those things which reasonable diligence on his part would bring to his attention.

That same concept was reflected in the portion of *Upton* cited in *Vargas*:

> It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written.

On the other side of the coin, there is something disquieting about the notion an agreement is conclusively deemed free of fraud—as a matter of *law*—unless the instrument evidencing that agreement is ambiguous. Fraudulent misrepresentation, after all, is a classic example of a *fact* issue.

■ This case does not force a choice between those competing perspectives. It must be remembered one of the elements of fraudulent misrepresentation is that the representation shall have been *reasonably* relied upon. *Classic Bowl, Inc. v. AMF Pinspotters, Inc.*, 403 F.2d 463, 466 (7th Cir.1968) (quoting *Wilkinson v. Appleton*, 28 Ill.2d 184, 187, 190 N.E.2d 727, 729–30 (1963) but reflecting the universal common-law rule). And one useful way of looking at the *Upton-Vargas* canon is that it reflects the conclusive unreasonableness of relying on a misstatement as to a crystal-clear document that is before the hearer's eyes for examination.

■ From that viewpoint the Release and Lassila's claimed misrepresentation as to its purpose leave room for a jury's determination. Certainly the middle portion of Release ¶ 1, with its classic "any and all claims ..." language, were it the sole language in the release, could properly be characterized as unambiguous. But after all the "including, without limitation" clause—with its specific reference to the Stieren account alone—was being read by an unrepresented nonlawyer [16] who was simultaneously being assured the document was linked only to the commission payment on that account. And that assurance could reasonably be viewed as buttressed by the fact that the middle portion

---

any event, *Richard's Lumber, id.* at 20–21 emphasized specific facts showing plaintiff knew what it was undertaking when it released its claims.

16. True enough, J.L. Griswold is apparently a man of means who can afford to invest $1 million at a crack, nor does he plead special naivete. But those facts are appropriately part of the framework for a jury's determination of the reasonableness of J.L. Griswold's reliance.

of Release ¶ 1 (the broad general-language part) specifically excepted Stieren from the persons released.[17]

That factual matrix renders the determination whether reliance on that assurance was reasonable (effectively a determination whether the Release as a totality could be perceived as ambiguous under all the circumstances) peculiarly appropriate for lay jurors who have not (unlike judges) read—and prepared—releases by the hundreds or thousands. There are many respects in which it is not a fiction (even an amiable one) for a judge to decide that no reasonable person could reach a particular conclusion, but in the context of a release document such as the one at issue in this case it is self-delusive to think a judge can wipe out the effect of decades of legal training and practice, restoring himself or herself to the pristine condition of having to read a release for the first (or second or third) time.

Consequently it is unnecessary to decide whether *Dice*, which left to a jury the question of the reasonableness of reliance on misrepresentations contradicted by the text of an FELA-claim release, should be extended to all federally created causes of action. This Court need hold only that given the language of the Release here and the environment in which it was signed, it is likewise for a jury to decide whether a misrepresentation was in fact made and whether J.L. Griswold reasonably relied on that representation in signing the Release.[18] And this Court does so hold (at least as to federal claims, where the *Dice*

concept is part of the web of authority for judicial decision). In sum, the Release is not a bar to Griswolds' suit under RICO and CEA at this stage of the proceedings.

■ Griswolds' state-law claims pose even less of a problem. It has already been said Illinois conforms to the universal rule: Reliance on a misrepresentation must be reasonable to constitute fraud invalidating a contract. Thus the just-completed analysis might perhaps apply (even absent a *Dice*-type Illinois precedent) in any event. But there is more, for the gravamen of Griswolds' state-law claims is breach of fiduciary duty. Commodities brokers are related to their customers as agent and principal. *Martin v. Heinold Commodities, Inc.*, 139 Ill.App.3d 1049, 94 Ill.Dec. 221, 487 N.E.2d 1098 (1985). Further, as *Nairn v. J.A. Acosta & Co. (In re Rosenbaum Grain Corp.)*, 103 F.2d 656, 660 (7th Cir.1939) said:

> This relation, contemplating as it does the holding by the broker of the customer's money and other property, is primarily fiduciary in nature.

■ Contracts between fiduciaries are "especially vulnerable to attack" when a fiduciary has misrepresented material facts. *Wilkinson*, 28 Ill.2d at 188, 190 N.E.2d at 730. Such contracts must be "open, fair and deliberately made" to be valid. *Id.* Griswolds allege Lassila both (1) concealed facts giving rise to claims against Hutton (e.g., lack of a coordinated trading plan, aggregate total trading and commissions and failure to supervise Advisers' activity) and (2) misled J.L. Griswold as to the extent of the Release.[19] Whether

---

**17.** Griswolds had no claim against Stieren except with respect to the specific account he was handling—the very account specified in the "including, without limitation" clause. Hence a rational reader (if unfamiliar with the language and structure of release documents) might arguably understand the entire Release to be limited in the way Lassila represented.

**18.** J.L. Griswold does not claim (nor could he, for the reasons stated in the *Upton-Vargas* line of cases) he did not *read* the Release—only that he relied on Lassila's characterization of its scope.

**19.** Hutton-Lassila Mem. 11 suggests Griswolds' allegation they were promised a coordinated

trading plan contradicts their argument Lassila misled them as to the extent of the Release. That is said to follow because Griswolds' belief that all accounts at Hutton "were being coordinated and jointly managed" would make it impossible for them also to believe they could release Hutton as to liability for Stieren's account alone. That argument is no better than makeweight (if that). Lassila's January 28, 1984 letter to J.L. Griswold does not even advert to the other accounts. It simply reflects how Stieren had gotten out of line and promises "an effort to obtain a large discount for this account." When that was done and Lassila met with J.L. Griswold to deliver the check, it would appear wholly inconsistent with Lassila's fiduciary obligations for him to tender to his cestui

or not those actions by Lassila amounted to fraud under Illinois law via the earlier analysis in this opinion, at a minimum the allegations state a claim for breach of fiduciary duty. *Martin*, 139 Ill.App.3d at 1057, 94 Ill.Dec. at 226, 487 N.E.2d at 1103.

### Failure To State a Claim

With the Release eliminated as a legal (though not necessarily a factual) bar to this action, this opinion can at last turn to the Hutton-Lassila challenges to the Complaint's statement of substantive claims. Those challenges address both of Griswolds' principal allegations of fraud:

 1. churning;

 2. various instances of material nondisclosure and deception.

### 1. *Churning*

Churning is a broker's trading for the purpose of generating commission fees without regard to the client's investment objectives. *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417, 435 (N.D.Cal.1968), *aff'd as modified*, 430 F.2d 1202 (9th Cir. 1970) stated the classic definition:

> Churning cannot be and need not be, established by any one precise rule or formula. The essential question of fact for determination is whether the volume and frequency of transactions, considered in the light of the nature of the account and the situation, needs and objectives of the customer, have been so "excessive" as to indicate a purpose of the broker to derive profit for himself while disregarding the interests of the customer.

 Churning is a fraudulent practice under Securities Exchange Act § 10(b), 15 U.S.C. § 78j(b) (*Hecht*, 283 F.Supp. at 433) as well as under the CEA, 7 U.S.C. § 6b (*Johnson v. Arthur Espey, Shearson, Hammill & Co.*, 341 F.Supp. 764, 766 (S.D. N.Y.1972)). Though the principles governing proof of a churning claim are the same

whether a securities or commodities fraud is alleged, it should be understood an amount of trading "excessive" in a securities account may not be "excessive" in a commodities account. That is so because (*Booth v. Peavey Co. Commodity Services*, 430 F.2d 132, 134 (8th Cir.1970)):

> The commodity markets are highly volatile and are thus trading rather than investing vehicles.

And that is especially true where the customer, like Griswolds, is speculating rather than hedging (*id.* at 135).

Hutton and Lassila say Griswolds cannot meet the *Hecht* test because Stieren's trading was not excessive in light of Griswolds' "needs and objectives." Their Mem. 12 argues J.L. Griswold's "acknowledgement" of Lassila's January 28, 1984 letter "confirm[ed] that the specified level of trading was consistent with plaintiffs' objectives."

In the initial pleading posture of this case, that is a weak reed at best. Quite to the contrary, a fair reading of Lassila's letter and J.L. Griswold's acknowledgement (especially with all reasonable inferences drawn in Griswolds' favor, see n. 2) could just as well be that the commissions (and trading) were running too high and a discount was in order. Lassila's letter is simply too opaque, and J.L. Griswold's "acknowledgement" too curt, to constitute a satisfactory expression of Griswolds' investment objectives. Compare, e.g., *Costello v. Oppenheimer & Co.*, 711 F.2d 1361, 1363–64, 1368–69 (7th Cir.1983) (discussing evidence supporting jury finding customer's "investment objectives were not unduly ambitious," *id.* at 1368).

 Even were J.L. Griswold's acknowledgement viewed as an approval of Stieren's trading strategy, that would not bar a churning claim as a matter of law. Brokers bear some independent responsibility to see that trading on a customer's behalf is not inappropriate to the customer's "known financial condition." *Hecht*, 283 F.Supp. at 432.[20] Though an investor's

---

que trust another document with the undisclosed intention of obtaining a sweeping "all claims" release. And if Lassila then had no such intention, so that he himself did not understand the Release to cover all possible claims of all types, other problems would attend his present effort to urge a general release.

**20.** This case does not involve a so-called "discount broker" who engages to provide no expert advice (and therefore might argue for a lesser degree of fiduciary duty). Griswolds placed their money in Hutton's hands and clearly relied on the Advisers to conduct trading.

stated objectives "significantly illuminate" a claim of excessive trading and make it "easier to conclude" trading is not excessive if the goals are "aggressive or speculative," the goals alone do not decide the issue. *Costello,* 711 F.2d at 1368.

■ As already stated, Stieren's account trading generated commissions in just two months' time that ate up almost exactly 50% of the original funding of $400,000. Griswolds' claim of churning on that score survives Hutton and Lassila's motion to dismiss.

### 2. *Material Nondisclosure and Deceptions*

■ Lastly Hutton and Lassila say everything Griswolds now allege as nondisclosure or deception was in fact disclosed in the various documents signed by Griswolds when setting up their accounts with Hutton and the Advisers. All those documents are attached to the Complaint and (for the reason already discussed) may be considered on this motion to dismiss.

In particular, Hutton and Lassila point to Client Agreement ¶ VIII(b) (Ex. A–1 at 3):[21]

> I understand that your corporation is no way responsible for any loss to me occasioned by the actions of the individual or organization named above [i.e., the Adviser] and that your corporation does not, by implication or otherwise, endorse the operating methods of such organization.

That language is not dispositive here for two reasons:

First, Griswolds allege Lassila promised he would oversee and coordinate the activities of the Advisers for purposes of risk control, and he failed to do so (¶ 23). That promise, if proved, would be a separate agreement, rendering inapplicable the Hutton-Lassila reliance on *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426, 430 (9th Cir.1978). Griswolds do not ask this Court to assume a state of

facts *contrary* to the undertaking in the Client Agreement. Instead they allege *additional* facts.

■ Second and more importantly, Griswolds do not claim Hutton and Lassila liable for the "actions of the individual or organization" or for the "operating methods of such organization"—a kind of agency notion. They rather contend Hutton operated MCAP as a scheme to defraud. According to the Complaint, Griswolds' losses are ascribable to Hutton's overall design of the plan, not to individual mistakes of the Advisers. Nothing in the Client Agreement is a disclaimer of that risk.

■ Hutton and Lassila direct one last salvo at Griswolds' claim about the use of "fifty cent dollars" to generate excess trading activity and thus excess commissions. They rightly point out each of the individual contracts signed with the outside Advisers (Exs. A–2 to A–7) reflects an account size of twice the actual funds deposited with Hutton. It is also true the Cresta and ICSC contracts (but not the others) specify fees would be based in part on account size.

But again Hutton and Lassila fail to grasp the essence of Griswolds' claim. Griswolds charge Lassila represented to them funding in "fifty-cent dollars" was customary and would be advantageous to Griswolds, all the while knowing that was false and the purpose of funding in "fifty-cent dollars" was to generate increased commissions.[22] Griswolds do not seek to lay the excess trading at the Advisers' doors (except in the case of Hutton's own employee, Stieren, who did not trade in "fifty-cent dollars"). Rather they assert the representation that "fifty-cent-dollars" funding would be beneficial to their investment interests was a fraud. Disclosure to Griswolds of the method by which Advis-

---

**21.** Griswolds' Complaint attaches only the Client Agreement as to Stieren's account. Hutton and Lassila predicate their position on the signing of similar agreements in connection with each Adviser's account.

**22.** According to the Complaint, only a relatively small portion of Griswolds' trading expenses ($19,708) went in fees to Advisers, while the major portion ($298,827) went in sales commissions to Hutton for executing Advisers' trades.

ers' fees would be calculated does not bear on that issue.[23]

In sum, the threshold attack on the misrepresentation claims fails as well. They too remain viable at the pleading stage.

### Conclusion

Hutton's and Lassila's motion for their dismissal from the Complaint is denied. They are ordered to answer the Complaint on or before December 6, 1985.

---

**23.** This Court's August 26, 1985 oral bench ruling struck from the RICO count Griswolds' prayer for an accounting of "secret profits" obtained on the use of their funds on deposit with Hutton. Under CFTC rules (17 C.F.R. § 1.29) any interest obtained on investment of customers' funds while on deposit may be kept by a broker. Neither side, however, has addressed Griswolds' prayer for an accounting of interest under their state-law theory.