## GENERAL AGGREGATE CORPORATION, Appellant,

v.

## Don E. LaBRAYERE, Respondent.

Nos. 47075, 47076.

Missouri Court of Appeals, Eastern District, Division Three.

Feb. 7, 1984.

Motion For Rehearing and/or Transfer to Supreme Court Denied March 8, 1984.

Application to Transfer Denied April 16, 1984.

902

Edward C. Cody, St. Louis, for appellant.

David L. Welsh, St. Louis, for respondent.

REINHARD, Judge.

Defendant appeals from a judgment entered on a jury verdict for plaintiff in the amount of $36,800.00. Plaintiff has filed a cross appeal from the trial court's refusal to award pre-judgment interest. We affirm in part and reverse and remand in part.

This action was tried on Count III of plaintiff's second amended petition in which plaintiff alleged that it provided consultant services and general management guidance to defendant to assist him in the acquisition of a quarry business known as the Hunt Quarry, for which services plaintiff was

entitled to recover $36,800.00 in quantum meruit.

In 1971, Marlin J. Veesaert founded General Aggregate Corporation, a one man corporation which provided general management consultation services to mining and aggregate businesses throughout the United States and abroad. Veesaert had an extensive background in geology and mining. He had both a baccalaureate and a masters degree in geology and additional coursework in geophysics, economic geology and business. Prior to the formation of General Aggregate, he had worked as vice-president of St. Louis Slag Products and Lincoln Stone.

In 1972, defendant was the president and a stockholder in Earthmoving, Inc. (EMI), a corporation whose primary business was grading subdivisions and industrial parks. John Givens, Ed Ryder and defendant's father, Ray LaBrayere, were the remaining shareholders. At that time, the company decided to enter the quarry business by acquiring the 56 acre Pitman farm near Wentzville in St. Charles County. The Pitman farm was raw ground and did not have an operating quarry on it. Test drilling had to be done on the property in order to determine its suitability as a quarry. Test Drilling, Inc. was hired to perform that task. Defendant testified that Don Ramsey of Test Drilling brought "Marlin [Veesaert] along because we needed help to go about doing this .... I don't know how to do it and he brought Marlin along because that is the nature of his business ...."

Because of EMI's need for expert advice in the quarry business, plaintiff and EMI entered into a contract which provided that General Aggregate would "act as Earthmoving, Incorporated's sole general management agent in the planning, opening and equipping of Earthmoving, Incorporated's Quarry Co." Towards that end, General Aggregate would work to acquire zoning approval for the quarry and for a period of eight years after zoning was obtained would:

1) study and select all plant and mobile equipment necessary to remove, crush, screen, handle and sell crushed stone;

2) provide consultation concerning installation of the plant and opening of the quarry;

3) recommend quarry supervisory personnel;

4) recommend pricing for crushed stone;

5) assist in acquisition of licenses and permits;

6) assist management with consulting services.

General Aggregate would be paid $35.00 per hour for Veesaert's time and in addition, would receive a fee of ten percent of all cost outlay as goods, equipment, additional lands and services were acquired during the full term of the contract. Defendant signed the agreement in his capacity as president of EMI. During the fall and winter of 1972–73, Veesaert worked extensively on rezoning for the Pitman farm. Ultimately, in 1973, rezoning was denied by St. Charles County. In January, 1973, Vic Koepke, operator of an excavating company and a competitor of EMI, approached Veesaert about working for him. Veesaert testified he declined the work because he would be in competition with EMI. Defendant agreed with that assessment.

While the application for rezoning of the Pitman property was pending, two of the principals of EMI instructed Veesaert to "find an alternate site to the Wentzville site, a going operation if possible ...." He examined numerous quarry operations throughout Missouri in early 1973. During the summer of 1973, Veesaert testified there was continued interest by EMI and defendant in a going quarry operation.

On July 12, 1973, defendant, Veesaert and Don Ramsey took an aerial tour of several eastern and central Missouri quarries, including the Hunt Quarry. Veesaert testified that he learned the Hunt Quarry was for sale from the executive director of

the Missouri Limestone Producers Association. Defendant testified that he knew Hunt was in financial trouble. Veesaert testified that based on "the geology ... the condition and the quality of the rock at that location I ... thought it might be a very, very good area." Defendant then directed Veesaert to find out how much Paul Hunt wanted for the quarry.

On October 1, 1973, Veesaert and defendant discussed the future of EMI and the possible liquidation of EMI's earthmoving equipment. Veesaert testified defendant requested him to proceed to meet with the Hunts on defendant's behalf or behalf of whomever defendant represented.

On October 3, 1973, Veesaert presented an agreement to defendant to be signed by defendant, as president of Earthmoving, Inc. and by defendant, individually. The agreement provided that General Aggregate would act as defendant's or Earthmoving's sole and exclusive management agent and would:

1) study and select all plant and mobile equipment necessary to remove, crush, screen, handle and sell crushed stone or aggregate;

2) provide consultation concerning installation of the plant and the opening of the quarry at a new location or those revisions and modifications in the interest of operation efficiency at an existing operation;

3) recommend quarry supervisory personnel;

4) recommend pricing of aggregate and evaluation of markets;

5) assist in the acquisition of licenses and permits;

6) closely assist management with general consulting services.

The agreement provided for compensation at the rate of $35.00 per hour and "ten percent of all cost outlay ... as goods, equipment, services, additional lands, and other companies or operations and services are acquired during the full term of the contract."

Defendant did not sign the agreement. Veesaert testified that defendant "said not to be concerned about it, that he did not want to sign it at that time, that the fee would be paid, that we would go just as before on the initial agreement and that I should not be concerned about it and that it would be paid."

On October 5, 1973, Veesaert inspected the Hunt Quarry and prepared a memorandum. The inspection entailed a detailed geological examination of the quarry, the crushing plant and operations, employees and pay scale, and pricing structure of the aggregate sold. On October 10, defendant proposed to Veesaert that he pay $50.00 per hour (instead of $35.00 per hour) and give plaintiff 30% of the company stock in lieu of the 10% contingent bonus. Veesaert rejected the offer. On October 16, 1973, defendant and Veesaert had a second meeting with Paul Hunt at the quarry to further investigate the quarry and its operations. On October 26, 1973, Veesaert met with the Hunts to examine in detail their financial statements, including sales and cost figures, as well as a depreciation schedule for all equipment. He met with defendant that afternoon to discuss his findings and prepared a detailed memorandum two days later.

Veesaert testified that defendant reiterated during this period that he would be paid, that he did not need to concern himself about that; he could be well assured that defendant had been instructed by his father to pay his debts and he considered this a just debt which would be paid.

In early December, 1973, defendant resolved that Hunt's price for the quarry was too high. He decided to stop looking for a quarry and opened a pizza parlor. At some time in the winter or early spring of 1974, EMI ceased doing business and a decision to liquidate its assets was made.

On February 1, 1974, Veesaert received a call from Paul Hunt that he wanted to sell the quarry very badly. Veesaert passed this information on to defendant. On

March 6, 1974, Paul Hunt attended the final liquidation auction of EMI and asked defendant if he wanted to see the quarry again. Shortly thereafter, defendant met with Hunt at the quarry and they began serious negotiations for its purchase. Veesaert testified that on April 1, 1974, defendant called him and told him that he had reached an agreement with Paul Hunt to purchase the Hunt Quarry for $368,-000.00. Veesaert suggested that defendant hire Dave Merks, Quarry Superintendent of O'Fallon Quarry. Defendant authorized Veesaert to meet with Merks and prepare an incentive employment contract to entice Merks to quit his job at O'Fallon Quarry and work for defendant. Merks accepted the proposal Veesaert prepared.

Defendant testified that he needed Veesaert's help to measure the stockpiles, inventory and other such items. Veesaert had numerous meetings with defendant and his attorney in regard to preparation of the written contract. On April 18, 1974, Veesaert and defendant went to the Hunt Quarry to examine the rock and Veesaert photographed the equipment for documentation purposes.

The contract price was $368,000.00; $168,000.00 for the land, $200,000.00 for all remaining assets. The sellers conveyed to defendant the quarry, plant, facilities, including real property, furniture, fixtures, equipment and machinery used in connection with the operation of the quarry, trucks, trailers, automobiles and the rolling stock used in the quarry operation and stockpile inventory located at the quarry operation based upon actual, usable inventory on and at the close of business on May 1, 1974. Also included in the sale were finished products on the quarry site, existing contracts between seller and his customers, outstanding bids made by sellers for material to be furnished by the quarry which result in awards to sellers, accounts receivable, leases, contracts and agreements between seller and third parties pertaining to quarry operation. The contract

was closed on May 16, 1974, and defendant took title to all of the property in his name alone. Veesaert was not present at closing. EMI was officially dissolved on May 21, 1974. On June 20, 1974, Veesaert met with defendant at the quarry and inspected files, equipment and rock. Sales potential for the quarry were discussed.

In July, 1974, Veesaert testified he met with defendant who stated he wanted two years to pay the 10% fee to which Veesaert agreed. Ultimately the hourly charges of $6,125.39 were paid, but defendant refused to pay the 10% fee.

Defendant admitted he told Veesaert that he did not need to worry about payment and that he did not need a new agreement, but that it was EMI's obligation, not his own. He acknowledged that he had relied heavily upon Veesaert's advice; that Veesaert did good work and that he accepted his services. He acknowledged there was confusion as to whether he or EMI was seeking the quarry. He was unable to state at what time EMI ceased looking and he became the prospective purchaser. At the time of trial, defendant still owned the quarry and Dave Merks was quarry supervisor.

Plaintiff's petition sought recovery against defendant on both express contract and quantum meruit theories. The case was submitted to the jury on quantum meruit. The jury was instructed to return a verdict for plaintiff if plaintiff "furnished consultant services and general management guidance" which defendant accepted.

Defendant's principal point on appeal is that § 339.160 bars plaintiff from recovery because Veesaert was not a real estate broker or salesman. Section 339.160, RSMo.1969, provides:

> No person, copartnership, corporation or association engaged within this state in the business or acting in the capacity of a real estate broker or real estate salesman shall bring or maintain an action in any court in this state for the

recovery of compensation for services rendered in the buying, selling, exchanging, leasing, renting or negotiating a loan upon any real estate without alleging and proving that such person, copartnership, corporation, or association was a licensed real estate broker or salesman at the time when the alleged cause of action arose.

Section 339.010.1, RSMo.1969, provides that:

A "real estate broker" is *any person,* copartnership, association *or corporation,* foreign or domestic, *who advertises, claims to be or holds himself out to the public as a real estate broker or dealer and who for a compensation or valuable consideration, as whole or partial vocation,* sells or offers for sale, *buys or offers to buy,* exchanges or offers to exchange *the real estate of others;* or who leases or offers to lease, rents or offers for rent the real estate of others; or who loans money for others or offers to negotiate a loan secured or to be secured by a deed of trust or mortgage on real property. (emphasis added)

A real estate salesman is a person who becomes associated with a broker to do any of the things mentioned above. § 339.010.-2, RSMo.1969. Plaintiff counters that under Missouri law, the provisions of chapter 339 do not apply to the sale or exchange of businesses as going concerns, even though the sale may include some interest in realty as an incidental part of the sale, citing *Ingalls v. Neufeld,* 487 S.W.2d 52, 55 (Mo.App.1972). *Ingalls* does not stand for that proposition, but only acknowledges that rule as one view. See, for a general discussion of this issue, *Cary v. Borden Company,* 153 Colo. 344, 386 P.2d 585, 586–87 (1963). We need not resolve the issue plaintiff raises because we have concluded that plaintiff was not a real estate broker or salesman as defined in § 339.010, RSMo. 1969.

■ Under the first part of the definition, we have concluded that Veesaert nei-

ther advertised, claimed to be nor held "himself out to the public as a real estate broker or dealer." Defendant was first introduced to Veesaert, not as a real estate broker or salesman, but as an expert geologist to examine core samples taken on the Pitman farm. There is no evidence in the record that Veesaert ever held himself out to the public, the defendant or any of the principals in Earthmoving, Inc. or Hunt Quarry as a real estate broker. *White v. Miriam Realty Co.,* 547 S.W.2d 184, 186 (Mo.App.1977).

■ Within the second part of the definition of real estate broker, we do not look merely at the labels, which the parties may use but at the legal effect of the plaintiff's role in this transaction. *Dolan v. Ramacciotti,* 462 S.W.2d 812, 815 (Mo. banc 1970); *White v. Miriam Realty Co.,* 547 S.W.2d 184, 187 (Mo.App.1977).

Our research has not disclosed any Missouri case with a similar fact pattern. The most analogous fact pattern is *Ingalls v. Neufeld,* 487 S.W.2d 52 (Mo.App.1972) which was resolved on the pleadings. In *Ingalls,* plaintiff, a pharmaceutical salesman, without a brokers license, filed suit to recover 10% of the sales price of a nursing home for finding a buyer for defendant's business as a going concern. The trial court dismissed the petition because plaintiff was not a broker and § 339.160 barred recovery. The court of appeals reversed holding that the illegality did not appear on the face of plaintiff's pleading and remanded the cause to allow a fuller development of the facts. *Ingalls* is not applicable to our case under review.

In other cases involving § 339.160, the courts focus their attention on the role the plaintiff played in finding a customer, as well as his participation in negotiations between the purchaser and seller. *Dolan v. Ramacciotti,* 462 S.W.2d 812 (Mo. banc 1970); *Miller Nationwide Real Estate Corp. v. Sikeston Motel Corp.,* 418 S.W.2d 173 (Mo.1967); *White v. Miriam Realty*

*Co.*, 547 S.W.2d 184 (Mo.App.1977). In *Miller*, the Supreme Court held that plaintiffs were engaged in the business of real estate brokers because the plaintiffs found the customer and were the "dominant motivating force and parties negotiating the [contract] for their customer, ...." 418 S.W.2d at 178.

■ We have concluded that plaintiff was not performing the services of a real estate broker. In reaching this conclusion we emphasize the following facts. Neither the written contract with EMI nor the proposed contract with EMI and defendant obligated Veesaert to find a quarry or to enter into negotiations for its purchase. By the terms of the contract, he proposed to provide consultation services to defendant concerning quarry operations, hiring, pricing, and general management. These are precisely the services which he rendered. He was to be compensated for additions of personal property or real property whether he provided any advice or performed any service affecting the transaction at all.

Defendant was present during the aerial flight in 1973 when the Hunt quarry was first seen. He apparently knew that the Hunts were in financial trouble, and consequently, it is unclear precisely the role which Veesaert played in bringing this property to defendant's attention. Serious negotiations towards purchase of the quarry began when defendant met Paul Hunt on March 6, 1974 at the EMI liquidation auction. Veesaert was not even present that day. We find little evidence in the record that Veesaert played any role in direct negotiations between the two parties up to the point on April 1, 1974, when defendant called Veesaert and informed him that he had reached an oral agreement with Paul Hunt to purchase the quarry. Neither was plaintiff present at the closing.

Defendant was a novice in the quarry business and desired expert geological and business advice which plaintiff provided. We have concluded that plaintiff's role was to advise defendant on the geological and financial aspects of operating a quarry for which he was paid an hourly wage and contingent compensation based on the growth of the business and was not a person who for "compensation ... as ... [a] vocation, ... buys or offers to buy ... real estate of others." § 339.010.1 RSMo.1969.

Any discussions which plaintiff had with either Hunt or other principals or employees of Hunt Quarry were principally concerned with the financial, geological and business aspects of the quarry operation to enable him to provide the advice contemplated in the proposed contract.

Plaintiff was to receive a reduced hourly rate for his expertise in return for the bonus contingency. If defendant's claim that the bonus compensation is barred by chapter 339 were correct, then it would also have been a bar to recovery for certain of the hourly charges. Defendant, however, concedes that plaintiff was entitled to the full amount of the hourly charges and in fact it has been paid.

■ We acknowledge that the real estate licensing statutes are an exercise of the police power designed to protect the public from the evils of fraud and incompetency. *Sandbothe v. Williams*, 552 S.W.2d 251 (Mo.App.1977). However, we find that the purpose of the statute was not violated by allowing plaintiff to recover for his services. No one was misled or defrauded. There was no danger of an unlicensed broker taking advantage of the public. *White v. Miriam Realty Co.*, 547 S.W.2d 184 (Mo. App.1977).

Viewed from a certain perspective, plaintiff's role at times appeared to be similar to a broker. However, after examining the transaction in its entirety, we have concluded plaintiff was not a real estate broker under § 339.010, RSMo.1969 and therefore § 339.160 does not bar this action.

We add one final thought before we examine defendant's next points. Section

339.010 was altered significantly in 1978 [1] and we have only considered plaintiff's conduct in light of the statute existing at the time of these events.

In defendant's next point, he contends the trial court erred in failing to grant defendant's motion for a directed verdict because the "evidence discloses that defendant never promised to pay plaintiff a ten percent commission upon defendant's acquisition of the Hunt quarry."

■ Plaintiff was not required to show that defendant made any such promise. Quantum meruit is based on a promise implied in law that a person will pay reasonable and just compensation for valuable services provided at that person's request and/or his approval. *McDowell v. Schuette,* 610 S.W.2d 29 (Mo.App.1980); *Bogert Construction Co. v. Lakebrink,* 404 S.W.2d 779 (Mo.App.1966). Defendant acknowledged that plaintiff performed a valuable service and that he had accepted those services. *See Hayden v. First Community State Bank of Savannah,* 575 S.W.2d 880 (Mo.App.1978). We find no merit to this point.

■ In defendant's last point, he contends that the court erred in failing to direct a verdict for defendant because "plaintiff failed to establish that its charges to defendant and the value thereof were reasonable." We find no merit to this contention for several reasons. First, the jury could have believed that defendant orally requested plaintiff to proceed and agreed to pay the 10% contingent bonus compensation. Where a plaintiff has fully performed a contract and all that remains thereunder is payment by the defendant, the plaintiff has a choice at his option of either suing on the contract or waiving the contract and suing in quantum meruit.

*Perles & Stone, Inc. v. Childs Co.,* 337 Mo. 448, 84 S.W.2d 1052, 1056 (1935); *Stewart v. Droste,* 294 S.W.2d 600, 603 (Mo.App. 1956). If the plaintiff elects to proceed in quantum meruit, he may introduce the contract evidence as prima facie evidence of reasonable value. *Humfeld v. Langkop,* 591 S.W.2d 251, 255 (Mo.App.1979); *Reed Schmidt and Associates, Inc. v. Carafiol Furniture Co.,* 469 S.W.2d 876, 880 (Mo. App.1971); *Curators of the University of Missouri ex rel. Shell-Con, Inc. v. Nebraska Prestressed Concrete Company,* 526 S.W.2d 903, 910 (Mo.App.1975). Moreover, we note that defendant offered plaintiff 30% of the business in exchange for the higher hourly fee and the 10% contingent bonus compensation which would have been worth more than $36,800.00. Finally, in a letter introduced into evidence, plaintiff described the compensation as a "fair and standard rate." A witness may place a value upon his own services. *Nesbit v. Shisler,* 175 Mo.App. 565, 158 S.W. 419, 420 (1913).

We now turn to plaintiff's appeal. After the verdict, plaintiff filed a motion requesting the trial court to add pre-judgment interest. The trial court denied the motion. Plaintiff asserts this was error. We agree.

■ Section 408.020, RSMo.1978, allows a creditor pre-judgment interest on liquidated claims after demand of payment is made. Even though this is an action in quantum meruit, that does not render plaintiff's claim unliquidated. In *Mid-west Engineering & Construction Co. v. Campagna,* 421 S.W.2d 229, 234 (Mo.1967), the Supreme Court quoting from *Laughlin v. Boatmen's National Bank of St. Louis,* 354 Mo. 467, 189 S.W.2d 974, 979 (1945), stated:

> On principle there is no reason for denying interest when the action is in quantum meruit and the claim is unliqui-

1. Section 339.010, RSMo.1978, now provides that a real estate broker is any "person, ... corporation, who for another ...
 (3) Negotiates or offers or agrees to negotiate the sale, exchange, purchase, rental or leasing of real estate;

(8) *Assists* or directs *in the negotiation of any transaction calculated or intended to result in the sale,* exchange, leasing or rental *of real estate;*

dated in the sense that the amount due is to be measured and determined by the standard of reasonable value of the services * * * If the defendant is liable for the reasonable value of services he is under a legal duty to liquidate the sum due and interest should be allowed from the time he should have paid * * * This principle has been applied often in actions for the reasonable value of work and labor.

 Defendant contends that the plaintiff is precluded from recovering interest because he failed to request it in his petition. Plaintiff did request the court to grant "such other relief as may be proper under the premises." In *Haynes v. Allen*, 482 S.W.2d 85, 89 (Mo.App.1972), this court stated that such a similar prayer authorizes a court to allow interest even though it was not specifically requested in the petition. Defendant also argues that the jury should have assessed interest if any was warranted and plaintiff's failure to tender an instruction which would have allowed the jury to make that determination prevents the trial court from assessing any interest after the verdict. We do not agree. Where the ascertainment of the amount of interest is only a matter of mathematical computation, the trial court may make the calculation. *See Hamra v. Boone County Development Co.*, 602 S.W.2d 721, 726–27 (Mo.App.1980) and *Errante v. Kadean Real Estate Co.*, 664 S.W.2d 27, 30 (Mo. App.E.D.1984).

 There is considerable confusion in the record as to the date plaintiff demanded payment. In any event, plaintiff is considered to have demanded payment no later than the day suit was filed. *Independence Flying Service, Inc. v. Ailshire*, 409 S.W.2d 628 (Mo.1966); *Industrial Bank and Trust Co. v. Hesselberg*, 195 S.W.2d 470 (Mo.1946). The trial court erred in failing to assess interest from the date suit was commenced.

The judgment of $36,800.00 is affirmed and the cause is remanded to the trial court to assess pre-judgment interest.

KAROHL, P.J., and CRANDALL, J., concur.