**Donald E. VOGEL, et al.,**
**Plaintiffs–Respondents,**

v.

**A.G. EDWARDS & SONS, INC.,**
**Defendant–Appellant.**

**No. 57461.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Dec. 31, 1990.

Jeffrey Joseph Kalinowski, William S. Port, St. Louis, for defendant-appellant.

Francis Eugene Pennington, III, Todd H. Iveson, St. Louis, for plaintiffs-respondents.

SATZ, Presiding Judge.

In this case, plaintiffs, Donald Vogel (Vogel) and John Hefele (Hefele), sued defendant, A.G. Edwards & Sons, Inc., alleging, among other things, that Fred Prewitt, a commodities and stock broker employed by defendant, breached a fiduciary duty Prewitt owed to plaintiffs.[1] Defendant appeals from a jury verdict in favor of plaintiffs in the amount of $125,000.00. We reverse and remand.

Vogel is a certified public accountant. Hefele is also a CPA and has a MBA. Vogel and Hefele were partners in several real estate ventures and owned apartment buildings financed in part by variable rate mortgages.

In November 1980, Vogel and Hefele each opened individual accounts with defendant. Hefele, however, gave Vogel a power of attorney authorizing him to purchase securities and commodities in Hefele's account. Some two months later, in January 1981, Vogel and Hefele opened a third account in the name of their real estate partnership, Dejon Investment.

According to plaintiffs, these accounts were opened for the purpose of trading in interest rate futures contracts as a hedge against their variable rate mortgages.[2] Prewitt was the broker responsible for handling the accounts. Vogel testified he gave Prewitt discretionary authority to trade in these accounts. He did not tell him when to trade, did not direct him to obtain plaintiffs' approval prior to any trade, and they followed all his recommendations.

In the first two weeks of trading in the partnership account, Prewitt, the broker, lost $169,000.00. Most of this loss was recouped in the following months, but then the account lost another $70,000.00 which was not recovered.

From the record, it appears there were daily trades in the accounts. According to plaintiffs, there were 1,482 trades, involving 5,320 futures contracts, from November, 1980 through October, 1981.

In October, 1981, Vogel became an employee of Edwards. He admits responsibility for the trading in the accounts after that time.

In February, 1986, Vogel and Hefele filed their petition against Prewitt and defendant A.G. Edwards & Sons, Inc. Prewitt died in April, 1986. Vogel and Hefele amended their petition, proceeding to trial against defendant A.G. Edwards & Sons, Inc. as the sole defendant, apparently, on the theory of respondeat superior.[3] This appeal followed.

### State Court Jurisdiction

■ Plaintiffs contend that Prewitt owed them a common law fiduciary duty to trade in their accounts for their benefit. He breached his fiduciary duty, they contend, by trading excessively in their accounts to earn commissions for himself rather than trading for their benefit. Plaintiffs characterize Prewitt's trading as a "churning" of their accounts.

Defendant contends the trades were trades in "securities" rather than "commodities", and, therefore, defendant ar-

1. We used the last names of the persons concerned for convenience and clarity, with no intent to be discourteous.

2. An extended discussion of an interest rate futures contract is neither essential or necessary here. A trade in this kind of contract differs substantially from a trade in shares of stock and from a trade in agricultural commodities. The former trade ultimately settles in cash, while the latter trades ultimately settle in delivery of the shares of stock or of the commodity.

A market in interest rate futures contracts can be made in the interest rate of certain chosen securities, for example, the interest rate paid by a group of government securities. The value of the futures contract in this interest rate would,

thus, vary as the interest rate of the group of securities vary.

Plaintiffs here had incurred a variable rate debt from the variable rate mortgages on the real property they owned. To hedge against an increase in this debt by trading in interest rate futures contracts, plaintiffs normally would trade in those contracts whose value varied inversely to the variance of the interest rate of their mortgage indebtedness.

3. We base this inference on plaintiffs' instructions. Plaintiffs claim is one of nine in their amended petition. From the record, we assume plaintiffs submitted their claim based upon Prewitt's trading in their partnership account.

gues, plaintiffs' churning claim can only be based upon violation of Rule 10b–5 of the Securities and Exchange Commission (SEC). The federal courts, defendant argues, have exclusive jurisdiction over this claim. Defendant's contention is based primarily on § 27 of the Securities and Exchange Act of 1934 Act which provides: "The district courts of the United States ... shall have exclusive jurisdiction ... of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter...." 15 U.S.C.A. § 78aa.

Whether trades in interest rate futures contracts are securities or commodities and whether these trades are governed by the Securities Act of 1933, § 17(a), 15 U.S.C.A. § 77q(a) and the Securities Exchange Act of 1934, §§ 10(b) and 15(c), 15 U.S.C.A. §§ 78j(b), 78o (c) and the SEC, or by the Commodity Exchange Act, 7 U.S.C.A. §§ 1–24 and the Commodity Future Trading Commission (CFTC) is not controlling here. Prohibition against a broker's churning of accounts is both expressed and implied in the provisions of both the Securities and the Commodity Acts and the rules of their respective regulatory Commissions. *See, e.g., Roche v. E.F. Hutton & Co., Inc.,* 603 F.Supp. 1411, 1414–1415 (M.D.Pa.1984); *Yancoski v. E.F. Hutton & Co., Inc.,* 581 F.Supp. 88, 90–92 (E.D.Pa.1983). And, churning in either security or commodity accounts, a violation of these federal prohibitions, gives rise to an implied private claim or cause of action. *See, e.g., Hecht v. Harris, Upham & Co.,* 430 F.2d 1202, 1206–07 (9th Cir.1970); *Roche* and *Yancoski, supra.* But, both federal and state courts have long recognized that the elements of a private churning claim based upon federally created rights may also give rise to a concurrent state common law claim based upon breach of fiduciary duty. *See, e.g., Miley v. Oppenheimer & Co., Inc.,* 637 F.2d 318, 325 n. 6 (5th Cir.1981); *Twomey v. Mitchum, Jones & Templeton, Inc.,* 262 Cal.App.2d 690, 69 Cal.Rptr. 222 (1968).

We, in Missouri, have not previously been called upon to recognize a concurrent state claim based upon churning, nor, in turn, called upon to open our courts to process the claim when an adequate private right and remedy exist in the federal courts.

The parties have not addressed these latter issues. However, for the reasons which follow, we recognize a concurrent state claim, and we have a constitutional mandate to keep our courts open to every person. Art. 1, § 14, Mo. Const. 1945.

Defendant raises several other issues on appeal. At least one has merit. We address that issue first and, then, address those issues which may arise again on retrial.

### Plaintiffs' Verdict Directing Instruction

Defendant argues that plaintiffs' verdict directing instruction did not submit all the essential elements of the churning claim to the jury. We agree.

Churning, as used by the parties here, is a term of art used to describe trading practices prohibited by the federal Securities and Commodity Acts and by their respective regulatory Commissions. Thus, to state the obvious, this term is given meaning only by the provisions of those Acts, the rules of those Commissions and the courts' interpretations of those provisions and rules. These sources are relevant to us only to the extent they define the elements of the private claim of churning in the federal courts and, in turn, to the extent we find it reasonable to use some or all of these elements to define a parallel private common law claim cognizable in the courts of our State.

In its simplest terms, churning is "excessive trading of a customer's account ... too much trading by the broker." 3 Johnson and Hazen, *Commodities Regulation* § 5.45, p. 128 (2d ed.1989). In most cases and commentary, churning is more specifically defined in the context of trading in shares of stock. *See, e.g. Costello v. Oppenheimer & Co.,* 711 F.2d 1361, 1368 (7th Cir.1983); *Mihara v. Dean Witter & Co.,* 619 F.2d 814, 820–21 (9th Cir.1980) (violation of the general antifraud provisions of § 10(b), Securities Exchange Act of 1934,

15 U.S.C.A. § 78j(b), and Rule 10b–5 of SEC, 17 C.F.R. § 240.10b–5); *Hecht,* 430 F.2d at 1206; *Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365, 368 (1st Cir.1973), *cert. den.* 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973); *reh. den.* 415 U.S. 960, 94 S.Ct. 1492, 39 L.Ed.2d 576 (1974) (violation of broker's standard of conduct in § 15(c), Securities and Exchange Act of 1934, 15 U.S.C.A. § 78o (c)(1), and Rule 15c 1–7 of SEC, 17 C.F.R. § 240.15c 1–7). However, churning is also a violation of the Commodity Exchange Act, 7 U.S.C.A. § 6b. *Griswold v. E.F. Hutton & Co., Inc.,* 622 F.Supp. 1397, 1407 (N.D.Ill.1985); *Johnson v. Arthur Espey, Shearson, Hammill & Co.,* 341 F.Supp. 764, 766 (S.D.N.Y.1972).

It is consistently stated that churning has three elements: (1) "control" of the account by the broker; (2) "excessive" trading in the account in light of the customer's investment objectives; and (3) the broker acted with the intent to "defraud" or with the wilful and reckless disregard for the interests of his customer. *See, e.g. Miley,* 637 F.2d at 324; *Mihara,* 619 F.2d at 820–21.

■ Plaintiffs attempted to parallel these three required elements in the context of our State's fiduciary law. Their verdict directing instruction required the jury to find

First, Frederick Prewitt was acting within the scope and course of his employment with defendant; and

Second, a fiduciary relationship existed between Mr. Prewitt and plaintiffs; and

Third, Mr. Prewitt had control of the trading in the plaintiffs' accounts; and

Fourth, Mr. Prewitt engaged in excessive trading for the primary purpose of generating commissions while disregarding the best interests of plaintiffs; and

Fifth, as a direct result thereof, plaintiffs were damaged.

Defendant contends the jury should have been instructed to determine whether the trading was excessive "in view of the investment objectives" of plaintiffs' account

and the failure to do so was prejudicial. *See, para Fourth, supra.*

To be sure, excessive trading gives the churning offense its name. The excessive amount of trades creates an inference the broker has disregarded his customer's interests in order to generate commissions for himself. But, whether the number of trades in an account is excessive and, thus, whether there is churning in the account depends upon the investment objectives of the investor. *Griswold,* 622 F.Supp. at 1407; *Miley,* 637 F.2d at 334. An amount of trading which would constitute churning "in an account of an investor whose objectives are income and long-term growth may not be churning in an account of an investor who is looking for short-term trading profits." Poser, *Options Account Fraud: Securities Churning in a New Context,* 39 Bus.Law 571, 584 (1984); *See, e.g. Griswold, supra* at 1407.

Here, the jury was simply required to find the trades were excessive and "for the primary purpose of generating commissions," while disregarding the best interests of plaintiffs. This fails to give the jury the essential guideline by which the number of trades must be measured to determine whether they constitute excessive trading: the investment objectives of plaintiffs.

■ Where, as here, there is no MAI Form, the instruction used must follow the substantive law and be understandable. *National Super Markets v. Shower,* 613 S.W.2d 154, 156 (Mo.App.1981). Moreover, it must submit every essential element necessary to prove plaintiffs' case. *E.A.U., Inc. v. R. Webbe Corp.,* 794 S.W.2d 679, 687 (Mo.App.1990); *Galemore Motor Co. v. State Farm Mut. Auto. Ins. Co.,* 513 S.W.2d 161, 167 (Mo.App.1974). Failure to do so is reversible error. *E.A.U.* at 687.

This does not end the matter, however. There is another critical defect in plaintiffs' verdict directing instruction, which we cannot leave uncorrected.

We have no quarrel with the instruction's failure to submit the broker's "intent to defraud." This is said to be an element of a churning claim based upon federal law,

because the implied federal private right for churning, particularly the right based upon Rule 10b–5, is said to be analogous to common law fraud. *Mihara, supra* at 821–22. And, thus, an element of the private claim is the "intent to defraud." *Id.* [4]

■ Here, if plaintiffs have a claim, it is a claim based upon a breach of fiduciary duty. Thus, although there is no need to require a finding of "intent to defraud", there is a need for the jury not only to find (1) the broker engaged in excessive trading in light of the investor's investment objective, but also to find (2) the broker did so with the intentional or reckless disregard of the investor's interest. In short, plaintiffs' instruction should also have required the finding of these two elements.

### Broker—Fiduciary

Defendant next argues that plaintiffs failed to show a fiduciary relationship existed between Vogel and Prewitt. Defendant also argues that plaintiffs' Instruction 6, submitting the issue of a fiduciary relationship, failed to submit all the elements necessary to create this relationship. Understandably, plaintiffs argue their evidence was sufficient and their instruction was proper.

Plaintiffs' Instruction 6 reads:

A "fiduciary relationship", as that phrase is used in these instructions, exists when there has been a special confidence reposed in someone who, under the circumstances, is required to act in good faith and with due regard to the interests of the one imposing the confidence. A "fiduciary relationship" can arise when a person entrusts his business affairs to another person and reasonably relies on that person to manage his business affairs in his best interests.

Plaintiffs base this definitional instruction on *McKeehan v. Wittels*, 508 S.W.2d 277, 280 (Mo.App.1974) which states:

A fiduciary relationship is created and established where there has been "a special confidence reposed in one who in

equity and good conscience is bound to act in good faith, and with due regard to the interests of the one reposing the confidence ..." *Klika v. Albert Wenzlick Real Estate Co., supra,* 150 S.W.2d at 24. A confidential relation exists when one relies upon and trusts another in regard to handling of property and business affairs, thus creating some fiduciary obligations.

Defendant argues this is an incorrect definition of fiduciary relationship and cites *Emerick v. Mutual Beneficial Life Ins. Co.,* 756 S.W.2d 513, 526–527 (Mo. banc 1988), for the proper elements:

(1) as between the parties, one must be subservient to the dominant mind and will of the other as a result of age, state of health, illiteracy, mental disability, or ignorance; (2) things of value such as land, monies, a business, or other things of value which are the property of the subservient person must be possessed or managed by the dominant party; (3) there must be a surrender of independence by the subservient party to the dominant party; (4) there must be an automatic or habitual manipulation of the actions of the subservient party by the dominant party; and (5) there must be a showing that the subservient party places a trust and confidence in the dominant party.

We have read these cases as well as the cases they rely on. We have no quarrel with their teaching on the general principles of a fiduciary relationship in the context of their respective fact situations. They have, however, no specific relevancy to the facts here.

■ Plaintiffs engaged Prewitt as their stockbroker. Missouri courts have uniformly held or stated that a stockbroker owes a fiduciary duty to his customer. *E.g. Leuzinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 396 S.W.2d 570, 575 (Mo. banc 1965); *Mercantile Trust Co. v. Harper,* 622 S.W.2d 345, 349 (Mo.App.

---

4. But, some federal courts have stated that the essence of the churning claim is "constructive fraud." *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 494 F.2d 168, 171 (10th Cir.1974); *Roche,* 603 F.Supp. at 1414.

1981); *Roth v. Roth,* 571 S.W.2d 659, 668 (Mo.App.1978). This is the understanding of Missouri law by our colleagues in the federal courts:

> Missouri law clearly imposes general obligations and duties upon stockbrokers. The general rule is that the relationship of the broker to its customer is fiduciary and confidential.
>
> *Smith v. Smith, Barney, Harris, & Upham & Co. Inc.,* 505 F.Supp. 1380, 1387 (W.D.Mo.1981).

Although the parties have not cited to us the portions of the record defining Prewitt's precise duties, they agree he had discretionary control over plaintiffs' accounts. In the seminal case of *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 951 (E.D.Mich.1978), the court discussed the nature of the relationship between a stockbroker and his customer. Where the account is non-discretionary and the customer rather than the broker makes the decision which stocks to buy and sell, the stockbroker's duties are somewhat limited. They are, nonetheless, fiduciary duties. The broker must study a stock before recommending it and inform the customer of the risks involved in the particular transaction. Beyond that, the duties are to refrain from self dealing and misrepresentation, follow the customer's order and disclose any personal interest in the transaction. *Id.* at 953.

A broker in a discretionary account has broader fiduciary duties. *Id.* He must "manage the account in a manner directly comporting with the needs and objectives of the customer." *Id.* He must also stay informed of the changes in the market, inform the customer of each transaction and explain the practical impact and risks involved in the trading strategy the broker uses. *Id.*

In short, according to the great weight of federal authority, a broker for a discretionary account is a fiduciary for the customer in his dealings with the account. *See McAdam v. Dean Witter Reynolds, Inc.,* 896 F.2d 750, 766–67 (3d Cir.1990) and cases cited therein. A broker under these circumstances must be held to a fiduciary duty because the relationship contemplates the broker holding and controlling money and property of the customer. *See Griswold,* 622 F.Supp. at 1406. This squares with our definition of a fiduciary.

■ In this case, Vogel testified he gave Prewitt discretion "to do what he felt necessary at any time, and whenever he felt it appropriate." Vogel did not tell Prewitt when to buy, sell or take a position, did not instruct Prewitt to clear trades in advance and did not direct the trading. Thus, the evidence clearly supports a finding this was a discretionary account. *McAdam, supra.*

As to the instructional issue, we believe the jury must be instructed to find a fiduciary duty on behalf of plaintiffs if they believe Prewitt had discretion to trade in the accounts without consulting with plaintiffs beforehand and plaintiffs did not direct Prewitt in the trading. However, this issue is already presented to the jury in the concept of churning. Churning requires that the broker exercise "control" over the account. *Miley,* 637 F.2d at 324. Churning, normally, cannot occur if the customer retains "control" over the account. *Leib, supra,* 461 F.Supp. at 957. Thus, a jury properly instructed on the definition of "control", as used in the verdict directing instruction on churning, necessarily has been instructed on the definition of the fiduciary relationship in issue here.

### Statute of Limitations

■ The parties agree that the statute of limitations for a claim for breach of fiduciary duty is five years. § 516.120(4) RSMo 1986. They disagree, however, as to the time the claim accrues in the present case and, thus, disagree when this five year limitations period begins. § 516.100

Section 516.100 attempts to avoid the unjust results which may occur when the cause of action is said to accrue prior to the manifestation of harm. A cause of action is, thus, not "deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and capable of ascertainment." *Id.* And, if "more than one item of damage" is sus-

tained, the cause of action does not accrue until the last item of damage is sustained and capable of ascertainment. *Id.*

Defendant contends the breach of duty here was Prewitt's alleged churning, and this claim of churning accrued, defendant contends, when plaintiffs knew or should have known Prewitt was churning their accounts. Defendant contends the time that plaintiffs "should have known" of the churning was the time they had facts sufficient to require a reasonable person to inquire into the possibility of churning. Thus, to defendant, these facts would put plaintiffs on notice to inquire.

According to defendant, plaintiffs knew by the end of January 1981 that Prewitt's trading was inconsistent with their hedge strategy; and, therefore, at that time, they knew or should have been put on notice to inquire about the alleged churning. Consequently, plaintiffs' claim accrued and the five year statute of limitations ended prior to the date plaintiffs filed their petition, February 4, 1986. Hence, defendant contends, plaintiffs' churning claim should be barred by the statute of limitations, as a matter of law, or, alternatively, the trial court should have submitted this issue to the jury.

Plaintiffs contend their claim did not accrue until their damages were "sustained" and "ascertainable," and, if there were "more than one item of damage" sustained, their claim would have accrued when the last item was sustained and ascertainable. § 516.100. Churning, plaintiffs contend, is a continuing offense and the resulting damages, "like the offense itself, are continuing in nature." Prewitt's churning, plaintiffs argue, continued until October, 1981; thus, the last item of damage could not be ascertained until then, and, the five year limitations period did not end until October, 1986, some eight months after they filed their petition.

We do not find plaintiffs' claim was barred by the statute of limitations as a matter of law. However, we find defendant was entitled to an instruction on the statute of limitations. We reach this con-

clusion for reasons different than those urged by the parties.

Churning is, indeed, a unified, continuing offense. *See, e.g. Miley,* 637 F.2d at 327. The crux of traditional churning is excessive trading in view of the customer's investment objective. *See, e.g. Hecht v. Harris, Upham & Co.,* 283 F.Supp. 417, 435 (N.D.Ca.1968), *modified in part and aff'd,* 430 F.2d 1202 (9th Cir.1970). The hallmarks of excessive trading "are disproportionate turnover [of the account], frequent in and out trading, and large brokerage commissions." *Carras v. Burns,* 516 F.2d 251, 258 (4th Cir.1975). Thus, at some point in the broker's trading, one of these factors, or, a combination of them compels the inference that churning took place. At this point, the broker has breached his duty to his customer.

The federal courts' application of a limitations period to churning claims is informative but not persuasive with regard to plaintiffs' claim of a breach of fiduciary duty. Federal securities law may not cover a churning claim if the churning constitutes only a breach of fiduciary duty. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480, 493 (1977). Churning under federal securities law, however, is normally more than that. The federal courts characterize churning as a deceptive practice which constitutes a violation of Section 10(b) of the 1934 Act and Rule 10b–5, *e.g., Carras, supra,* or as a "manipulative scheme" expressly prohibited by § 15(b) of the 1934 Act, 17 C.F.R. § 240.15c 1–7(a) (1982). *E.g., Dzenits,* 494 at 170. To these courts, churning is "fraud in law" or "constructive fraud." *Dzenits, supra* at 171; *see, e.g. Roche,* 603 F.Supp. at 1414–1415 (violation of § 4b of the Commodity Exchange Act).

But, there is no federal statute of limitations for civil actions generally, and there can be no "statute" of limitations for the private right for churning that has been implied by the federal courts from the prohibitions of the securities statutes. In deciding which state statute of limitations is most relevant to these prohibitions, the ear-

ly federal cases, as well as some recent ones, have rather uniformly followed the periods for actions grounded on fraud. *Dzenits, supra* at 171; *Weiser v. Shwartz,* 286 F.Supp. 389, 391 (E.D.La.1968); *see, e.g. Fratt v. Robinson,* 203 F.2d 627, 635 (9th Cir.1953); *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1041 (10th Cir. 1980). And, these statutes uniformly require the exercise of reasonable diligence by the plaintiff customer as a prerequisite to the accrual of the cause of action.

What constitutes reasonable diligence on the plaintiff customer's part, however, is itself a federal question. Loss, *Fundamentals of Securities Regulation,* Chap. 101, p. 1001 (1988). Consistently, the federal courts have stated the plaintiff customer cannot sit on his hands. He "must have exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." *Morgan v. Koch,* 419 F.2d 993, 997 (7th Cir.1969); *Loss, supra* at 1002 (cases collected).

> Investors are not free to ignore warning signals which would cause a reasonable person to ask questions, but must "exercise reasonable care and diligence in seeking to learn facts which would disclose fraud."
>
> *Koke v. Stifel, Nicolaus & Company, Inc.,* 620 F.2d 1340, 1343 (8th Cir.1980).

In short, in the federal courts, reasonable diligence requires the plaintiff customer to inquire.

This conclusion reached by the federal courts is not persuasive here. To be sure, plaintiffs' claim is based upon churning, but the churning is alleged to have been done by a broker, who, on the facts here, is a fiduciary under Missouri law. Thus, the appropriate or, at least, analogous definition of the accrual of plaintiffs' cause of action would be the definition of the accrual of a cause of action based upon the breach of a fiduciary duty. However, the parties have not addressed this issue and, thus, have not furnished us with a guide to applicable Missouri law.

Although the conclusion reached by the federal courts is not persuasive, their construct of churning as constructive fraud does make sense. Thus, to us, the accrual of a claim based upon churning is analogous to the accrual of a cause of action based upon fraud. § 516.120(5). This section makes "discovery" a prerequisite to the accrual of a course of action based upon fraud.

However, the required discovery depends upon and is determined by the relationship of the plaintiff and defendant prior to the commission of the fraud. There are three basic fact patterns.

If the plaintiff and defendant were dealing at arm's length, the cause of action for fraud accrues at the time the defrauded party knew of or by the exercise of reasonable diligence should have discovered the fraud. *Siler v. Kessinger,* 149 S.W.2d 890, 893 (Mo.App.1941). This puts an affirmative duty on the defrauded party to inquire, if reasonable diligence required the inquiry. *Id.*

If the relationship is "layman" and "expert," the layman has no duty to inquire and the cause of action accrues when the layman knew or had sufficient facts to question the expert's conduct. *See, e.g. Martin v. Crowley, Wade & Milstead, Inc.,* 702 S.W.2d 57, 58 (Mo. banc 1985). The layman has no duty, however, to "automatical[ly]" double check the services provided by a professional expert; for example, hiring another expert to check the work of the initial one. *Id.* at 58.

Where, however, there is a relationship of trust and confidence between the parties, it has been said the duty of the plaintiff to make inquiry and discover the facts surrounding the fraud is even further qualified. *E.g. Burr v. Nat'l Life & Acc. Ins. Co.,* 667 S.W.2d 5, 7 (Mo.App.1984). Because this relationship creates a sense of security which may be false, only actual discovery of the fraud serves to begin the period of limitations. *Burr, supra* at 7; *see also, Foster v. Petree,* 149 S.W.2d 851, 853 (Mo.1941); *Briece v. Bosso,* 158 S.W.2d 463, 467 (Mo.App.1942).

A careful reading of the latter cases and their progeny, however, reveals a rule no different from the rule applied in the layman/expert relationship. Thus, both in

*Foster* and *Briece,* the courts qualified the requirement of "actual discovery" with the phrases that plaintiff "is under no duty to make inquiry," *Foster,* 149 S.W.2d at 853, and if nothing occurred "to cause a reasonably prudent person to suspect fraud, he is not guilty of negligence in failing to ferret it out." *Briece,* 158 S.W.2d at 467. To us, this simply means the plaintiff had no duty to inquire to find facts or additional facts, but if he has sufficient facts to inform a reasonable person that a fraud has been committed then the cause of action for fraud accrues.

This interpretation is attractive here. Admittedly, it does require the customer to be more alert than simply permitting him to remain secure until he actually discovers the broker's defalcation. But, it does not require the degree of alertness required by the federal courts; a degree of alertness that does not fit comfortably within our applicable law.

More important, perhaps, it comports with practicality in the real world. To permit the customer the privilege of waiting until he actually discovers the broker's defalcation permits greater leeway to customers with federal churning claims to simply cross the street to a more inviting state judicial forum. It is not the probable additional work we shirk. It simply is ludicrous to extend an unlimited invitation to customers to our State's courts with a private churning claim that was created by the federal courts and developed and controlled in detail by them to comport with federal law.

Here, plaintiffs hired Prewitt as their agent to buy and sell interest rate futures contracts for them. Prewitt owed them a fiduciary duty to carry out these trades solely for their benefit. Thus, plaintiffs had no affirmative duty to double check or hire another expert to determine whether the trades were made for their benefit instead of Prewitt's. The only questions are: if and when plaintiffs knew or had sufficient facts to have known that Prewitt was churning.

This does not end the matter, however. Plaintiffs argue their cause of action did not accrue until the final trade in October of 1981 because that is when the last item of damage in issue was sustained. We disagree.

All parties agree the measure of damages here was the amount of commissions paid on trades made by Prewitt for his benefit and not for plaintiffs'. Thus, the damage plaintiffs sustained on any one trade not in their interest was the commission on that trade. Obviously, the commission on each of these trades was capable of ascertainment. Moreover, at the time plaintiffs knew or should have known an aggregate of a number of these trades show these trades were not made for their benefit but for Prewitt's, plaintiffs' cause of action for churning necessarily accrued, because the commission on this aggregate number of trades was simply the aggregate of the commissions on each of the individual trades. Thus, the fact that Prewitt continued to trade until October, 1981, cannot delay the accrual of the cause of action or limitations period, if churning did in fact occur before that date.

The converse, however, is also true. Once churning has been shown, each subsequent, separate trade continues the churning. This is simply an application of the "continuing or repeated wrong rule" adopted by our Supreme Court in *Davis v. Laclede Gas Co.,* 603 S.W.2d 554, 556 (Mo. banc 1980); *see also Nolan v. Kolar,* 629 S.W.2d 661, 663 (Mo.App.1982); and *Cacioppo v. Southwestern Bell Telephone Co.,* 550 S.W.2d 919, 925 (Mo.App.1977). Under this rule, "each continuation or repetition of the wrongful conduct may be regarded as a separate cause of action for which suit must be brought within the period beginning with the occurrence." Note, *Developments in the Law: Statutes of Limitations,* 63 Harvard Law Review 1177, 1205 (1950); *Davis, supra* at 556.

Here, once churning is established, plaintiffs would suffer fresh damage each day the trades continued. Thus, even if defendant shows the cause of action for churning accrued more than five years before plaintiffs' petition was filed, plaintiffs would still be entitled to any damages they

sustained from subsequent trades occurring within the five years immediately preceding the date the petition was filed.

■ We now turn to the question whether plaintiffs here, as a matter of law, had sufficient facts to inform a reasonable person that Prewitt was churning. Defendant relies primarily on plaintiff Vogel's testimony that the trading was not what he expected. Defendant also notes plaintiff Vogel received trade confirmations daily and received monthly account summaries. In addition, defendant presented testimony that Vogel was in defendant's offices almost daily in November, 1980, talking with Prewitt. Viewed in the light most favorable to plaintiffs, this does not establish that plaintiffs knew, as a matter of law, the trading was churning.

Although Vogel may have expected less trading, he testified he did not understand the significance of the number of trades. He further testified that when he complained to Prewitt he received assurances that "these types of losses had occurred before" and was encouraged to deposit more money in the account. As many courts have recognized, "churning is conduct which is not common to the experience of the ordinary individual, it is … not easily recognizable to unsophisticated investors." *Dzenits*, 494 F.2d at 172.

On retrial, whether plaintiffs' level of sophistication creates a jury question on the issue will depend on the evidence offered.

### Ratification

Defendant also argues the trial court erred in refusing its proffered instruction on the issue of ratification. The refused instruction stated:

> Your verdict must be for defendant on the claim of plaintiffs if you believe:
> First, plaintiff Donald Vogel was informed of the transactions made on behalf of plaintiffs by defendant, and
> Second, plaintiff Donald Vogel knowingly failed to object to such transactions within a reasonable period of time after having been informed of such transactions.

Defendant argues there was sufficient evidence to show plaintiff Vogel ratified the trades in the accounts.

Plaintiffs respond that ratification is not a defense to churning because the very elements of churning require a finding by the jury that plaintiffs lacked the ability to understand that the trading was churning and thus could not have ratified the trading. Plaintiffs argue a finding that a broker had control, as submitted to the jury in churning cases, precludes a finding of ratification and so submitting the issue of ratification would confuse the jury. We disagree.

There are three distinct methods of showing a broker's control over an account. Control exists when a broker trades in a discretionary account, when a broker usurps control in a nondiscretionary account or when the customer routinely follows the broker's recommendations concerning the handling of a nondiscretionary account. *Williamsport Firemen Pension Boards I and II v. E.F. Hutton & Co.*, 567 F.Supp. 140, 144 (M.D.Penn.1983). Usurpation or assumption of control can arise when the customer is particularly young or old, naive regarding financial matters or if the broker and customer are socially and personally involved with each other. *See Leib*, 461 F.Supp. at 954.

■ Ratification is an act by a principal whereby he adopts or confirms an act of another purported to have been done on behalf of the principal. *Wilks v. Stone*, 339 S.W.2d 590, 595 (Mo.App.1960). Ratification, however, requires that the principal have full knowledge of all material facts. *Id.*

Arguably, where control is established by the broker's usurpation or assumption of control, finding the fact of the control could amount to a finding that the customer lacked the ability to understand the trading was excessive. In such a case, the defense of ratification may be factually and logically inconsistent with the elements of plaintiffs' case.

In this case, plaintiffs submitted the issue of control to the jury in this definition:

The term "control" as used in these instructions means the exercise of authority by a broker over the trading in a customer's account where, due to lack of knowledge, sophistication or experience, the customer is unable to exercise independent judgment with respect to such trading.

On appeal, defendant has not challenged this instruction.[5] Assuming the instruction validly defines control in this case, we agree with plaintiffs. If the jury believes plaintiff Vogel was unable to exercise independent judgment, it would be inconsistent for them to find he had sufficient judgment to have recognized the trading as churning. Absent that recognition, no act of his could be found to have been a ratification of the trading.

Plaintiffs also argue defendant's instruction did not properly set out the law on ratification. We agree.

The instruction does not require the jury to find plaintiff Vogel knew the trading was excessive in light of the investment objectives of the accounts. As we held *supra*, this is a crucial fact in a churning claim. Without knowledge of this material fact, no act of plaintiffs' can be found to have been a ratification of the churning.

On retrial, if plaintiffs use the same instruction defining control, no instruction on ratification will be necessary. If plaintiffs use a different definition, on sufficient evidence, defendant may be entitled to submission of a ratification instruction if it properly states the law.

### Prejudgment Interest

At trial, plaintiffs proffered evidence relevant to prejudgment interest on their claimed damages. Defendant objected, and the court overruled the objection.

On appeal, defendant contends this evidence was inadmissible because (1) prejudgment interest is not recoverable on tort claims, and (2) if prejudgment interest were recoverable on tort claims, it would not be recoverable here because plaintiffs' claimed damages were unliquidated. We disagree.

■ As a general rule, prejudgment interest is not recoverable on a tort claim. *Lober v. Kansas City*, 100 S.W.2d 267, 268 (Mo.1936). But, like all general rules in law, this rule has exceptions. Where the defendant's tortious conduct confers a benefit upon the defendant, prejudgment interest may be recovered by the plaintiff on his claim. *Crawford v. Smith*, 470 S.W.2d 529, 533 (Mo.1971); *New Style Homes, Inc. v. Fletcher*, 606 S.W.2d 510, 513 (Mo.App. 1980); *see also, Iota Management v. Boulevard Inv. Co.*, 731 S.W.2d 399, 419 (Mo. App.1987).

■ The claimed breach of fiduciary duty here is tortious conduct which would confer a benefit upon Prewitt, the broker; namely, his commissions. Therefore, plaintiffs' claim fits within the exception to the general rule. *New Style Homes, supra.*

■ There likewise is a general rule that prejudgment interest is not recoverable on an unliquidated claim for damages. *See, e.g. Catron v. Columbia Mutual Insurance Co.*, 723 S.W.2d 5, 6 (Mo. banc 1987). But, as has been pointed out and demonstrated, "[t]he exceptions to the liquidation rule are legion." Mo. Damages, Chap. 19, *Attorney Fees and Interest*, § 19.64, pp. 19–49 (Mo. Bar 1988) and cases collected.

■ Defendant argues the damages here are not liquidated because the amount due was not definite, certain or readily ascertainable, citing *Ohlendorf v. Feinstein*, 670 S.W.2d 930, 935 (Mo.App.1984). In *Ohlendorf*, however, the court held the damages were not liquidated because the issue in dispute was whether plaintiffs would be damaged and by how much. *Id.*

Here, the parties agree the measure of damages should be the commissions charged on those trades constituting churn-

---

5. A simpler instruction would read:

The term "control" means either the broker, Prewitt, was given the discretion to buy and sell interest rate futures contracts in plaintiffs' account without approval or notice to the plaintiffs, or, the plaintiffs invariably relied on the broker's advice.
*See, e.g. Miley,* 637 F.2d at 334.

ing. This dispute, thus, centers on the issue of which trades, if any, constituted churning. Therefore, once liability is established, the measure of damages, the commissions on the trades, is readily ascertainable.

This application of the exception to the liquidation rule is justified by the apparent rationale of the Court in *Catron, supra.* In *Catron,* plaintiffs sued their insurance company for property damages they contended were covered by their policy seeking over $13,000.00 in damages. *Id.* at 6. Plaintiffs recovered less than $12,000.00, but the court affirmed an award of prejudgment interest. *Id.* at 6–7. The rationale, suggested by Judge Robertson in his concurring opinion, was: the damages were liquidated because the standard for measuring the damages was recognized, and the difference between the demand and actual award was due to differing estimates on the value of the property. *Id.* at 8.

*Catron* also answers defendant's additional argument that the jury's award for less than the amount requested demonstrates the claimed damages here were unliquidated. "An award of less damages than requested does not preclude an award of prejudgment interest on the ascertained damages." *Catron, supra,* at 7.

 Defendant also argues the jury was not properly instructed on the issue of damages. The instruction tracked MAI 4.01:

### Instruction No. 11

If you find in favor of plaintiffs, then you must award them such sum as you believe will fairly and justly compensate them for any damages you believe they sustained as a direct result of the conduct of defendant as submitted in Instruction Number 9 for which you find defendant liable.

As can be seen, the instruction fails to instruct the jury on the date interest begins to accrue.

Defendant argues that plaintiffs may recover interest only from the date of demand, and, since there was no evidence of a demand, the date of demand is deemed to be the date plaintiffs' petition was filed. Defendants rely on *General Aggregate Corp. v. LaBrayere,* 666 S.W.2d 901, 910 (Mo.App.1984).

Plaintiffs argue that a demand is only necessary when recovery is sought under statute, and, in *LaBrayere,* recovery was sought under § 408.020 RSMo 1978. Plaintiffs, however, stand the applicable rule on its head.

"An allowance of [prejudgment] interest must be based either upon a statute or a contract, express or implied." *Denton Const. Co. v. Mo. State Hw'y. Comm'n,* 454 S.W.2d 44, 59 (Mo.1970). But, plaintiffs do not argue an implied contract created a right for them to recover prejudgment interest. And, we are not required to develop an argument for plaintiffs and, then, search the record to support this argument.

Plaintiffs do argue, however, that they are entitled to this interest not as "interest," but as "common law compensatory damages," apparently, to compensate plaintiffs for the passage of time since accrual of their claim. Plaintiffs attempt to make a distinction where there is none. Prejudgment interest is compensation "allowed by law as additional damages for loss of use of the money due as damages, during the lapse of time since the accrual of the claim." McCormick, *Damages,* § 50 (1935). Whatever label plaintiffs attach to this type of money damages, these damages walk, talk and act like interest, and interest is interest, no matter the label.

Defendant also argues the damages instruction should be modified by adding the "interest tail" from MAI 4.04, which instructs the jury when prejudgment interest should begin to accrue. To us, this makes sense, if the evidence supports the modification.

Judgment reversed and cause remanded.

SMITH and GRIMM, JJ., concur.